# NORTHERN PACIFIC RAILWAY COMPANY *v.* AMERI-CAN TRADING COMPANY.

## APPEAL FROM THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 24. Argued October 26, 27, 1904.—Decided December 5, 1904.

A shipper in New York, after stating that he was about to make a contract of sale of lead in Japan during the Chinese-Japanese War, and that time of delivery was of vital importance, made a written contract with the general eastern agent of the Northern Pacific Railroad, then being operated under order of the court, by receivers, for shipment of 200 tons of lead at a given rate, to be shipped from Newark before a certain date to Tacoma and thence by Northern Pacific steamer sailing on a specified date. The receivers had a contract with the steamship company authorizing it to make through rates to Asiatic ports. The lead was shipped by the required date and after shipment the clerk of the shipper was given a bill of lading of the railroad company which he did not read and which contained a provision that the railroad company was not liable beyond its own line and which the shipper hypothecated with his bank as collateral. The lead reached Tacoma and was loaded on the steamer sailing on the day specified but the subcollector refused a clearance on the ground that the lead was contraband of war. The master thereupon unloaded the lead, obtained the clearance and sailed. The collector in answer to inquiries of the subcollector notified him not to withhold the clearance, but the vessel had sailed and the shipment was delayed so that it did not reach Japan until six weeks after the vessel specified in the contract, and after hostilities between China and Japan had ceased. Meanwhile the price of lead had fallen and the lead was sold at a loss. In an action by the shipper against the Northern Pacific Railway Company, which had acquired the road subject to all liabilities of the receivers. *Held:*

That the agent of the receivers was not the agent of the steamship company, but the contract made by him was on behalf of the receivers who assumed responsibility beyond the line of their own road; that under the order appointing them and directing them to operate the road, the receivers had power to make a contract of this nature and that it was within the scope of the powers of a general agent to make the contract on their behalf.

That a special written contract to transport by more than one line and to deliver within a specified time is not affected by a provision in the printed part of a through bill of lading, delivered as this was after the shipment of the goods, to the effect that the responsibility of the carrier issuing the bill of lading ceases at the terminus of its own line.

That as it is not illegal to export articles which are contraband of war al-
though the articles and the ship which carries them are subject to the risk
of capture and forfeiture, neither any law of the United States nor any
provision of international law was violated by the making of the con-
tract notwithstanding the lead was contraband and was to be delivered
in the port of a belligerent.
That a collector cannot legally refuse a clearance to a vessel bound to a
port of a belligerent because it has on board articles contraband of war.
That the mistaken act of a subordinate official not justified by law in re-
fusing a clearance to a vessel entitled to sail is not sufficient as an ex-
cuse for the nonperformance of the contract similar to that involved in
this case and is not a " restraint of princes, rulers or people " within that
clause of the bill of lading.

THE Northern Pacific Railroad Company made a certain
mortgage which was foreclosed, and the Northern Pacific Rail-
way Company purchased the property of the former company
under the mortgage at the foreclosure sale, and, by the order
of the court, the purchaser was required to pay all obligations
or liabilities contracted or incurred by the court's receivers,
who had been appointed in the foreclosure suit.  The Ameri-
can Trading Company, the appellee herein, intervened in that
suit, and, by its petition, asked that by virtue of the decree
in foreclosure the purchaser, the Northern Pacific Railway
Company, be required to pay damages for the failure of the
receivers to perform a special contract for the transportation
of goods from Newark, New Jersey, to Yokohama, in Japan.
The case was tried before the United States Circuit Court in
New York City, which dismissed the petition.  This decision
was reversed by the Circuit Court of Appeals for the Second
Circuit, and the railroad company was directed to pay the
damages therein stated to the American Trading Company,
the intervening petitioner.  The railroad company has ap-
pealed from such decree or order to this court.  The case was
tried upon the agreed statement of facts which follows:

1. In September, 1894, Thomas F. Oakes, Henry C. Payne
and Henry C. Rouse were receivers of the Northern Pacific
Railroad Company, under an order made in a suit bearing
the same title as the present suit, in the United States Circuit

Court for the Eastern District of Wisconsin, to which this suit is ancillary. Under that order the receivers were authorized to continue, and were continuing to carry on the business of the railroad in their charge.

2. The line of railroad in the possession of the receivers extended from Duluth, Minnesota, to Tacoma, Washington. The receivers had contracts with various carriers reaching points on their line, by which through bills of lading were issued from and to points not upon the line of the receivers' railroad, where the freight passed over some part of that line in transit. Among the carriers with whom the receivers had such arrangements was the Northern Pacific Steamship Company. This was an English company, operating a line of steamers between Tacoma and points in Japan and China, including Yokohama. The contract between the steamship company and the receivers was the contract originally made on March 30, 1892, between the Northern Pacific Railroad Company and the Northern Pacific Steamship Company, and ratified and adopted by the receivers under the authority of an order of the Circuit Court of the United States, made on September 13, 1893.

The receivers held no stock in the steamship company and had no other express contract relation with the steamship company. This stipulation is not to be accepted as an admission by the railroad company or the receivers or their counsel, that there were any relations between the receivers and the steamship company other than those growing out of the facts herein agreed upon.

For convenience in transacting their freight business in the eastern part of the United States, the receivers maintained an office in the city of New York, which was, in September, 1894, in charge of one George R. Fitch, who was their general eastern agent, and made arrangements for the transportation of freight over the receivers' line of railway and connections, including transportation to China and Japan.

At the time of the transactions referred to in this state-

ment of facts, the said Fitch had not received, nor did he receive, any direct or independent appointment or authority from the Northern Pacific Steamship Company to act as agent of that company. His only authority as agent of the steamship company was that created by, or arising from, the contract, Exhibit A. . Fitch knew that an arrangement had been concluded by the receivers and the steamship company by which contracts for through shipment to Yokohama might be made by the agents of the receivers, and through bills of lading issued, and he had been instructed by the receivers to solicit freight for through transportation upon bills of lading of which Exhibit C, hereto annexed, is a copy; but Fitch did not know the terms of the contract between the steamship company and the receivers, and the trading company did not know what company operated the steamships between Tacoma and Yokohama, or that the steamship company was a separate and independent company, or that there was any contract between the receivers and the steamship company.

It is further stipulated that Fitch had no express general authority to make contracts for through transportation, except as provided by the said bills of lading, and no authority to make the contract in question, unless such express authority be found in the telegrams, of which copies are hereinafter set forth; that the American Trading Company did not know the terms of his express authority, and that this stipulation is not to be taken as an admission by the railroad company or the receivers or their counsel that his implied authority was greater than his express authority.

4. The American Trading Company is, and was in September, 1894, a corporation organized under the laws of the State of Connecticut, having its principal office in the city of New York, and carried on a general commercial business with Asiatic ports.

5. In September, 1894, the trading company applied to Fitch for a rate upon a proposed shipment of pig lead from New York to Yokohama, Japan, and informed him that it

was of vital importance that the lead should be transported promptly and go forward by the earliest possible steamer, without delay, in order to enable the trading company to fulfill a proposed agreement which it was about to make for the sale of the lead in Japan, and which would require its delivery there at a fixed date. Fitch thereupon named a rate and undertook to forward the lead from New York on or before September 29th and *via* the.Northern Pacific steamer "Tacoma," sailing from Tacoma October 30, 1894.

6. Thereupon the trading company cabled to its agents at Yokohama, naming a price and a date at which the lead could be delivered there; and thereupon its agents in Yokohama made a contract for the sale of the lead, which contract provided that it should be delivered in Yokohama by overland route, and the most direct connection at San Francisco, Tacoma or Vancouver, and that in case of unusual or extraordinary delay in transit the contract should be null and void. Neither Fitch nor the receivers knew until September 24th that any contract for the sale of lead in Japan had been concluded by the trading company, and, except as hereinbefore and hereinafter stated, they never received any information in regard to its terms, as made or proposed. Upon the conclusion of its Japanese contract the trading company purchased two hundred tons of pig lead in bond from the Balbeck Smelting and Refining Company.

7. On September 19, 1894, Fitch, in confirmation of his previous statement, wrote and sent to the trading company the following letter:

Northern Pacific Railroad Company.

Thomas F. Oakes, Henry C. Payne, Henry C. Rouse, receivers.

Geo. R. Fitch, general eastern agent, 319 Broadway.

TRAFFIC DEPARTMENT, NEW YORK CITY, September 19, 1894.

American Trading Co. 182 Front St. city.

GENTLEMEN: I hereby confirm rate quoted you this day

and accepted by you on shipment of pig lead for export to Japan, as follows:

Pig lead, New York to Yokohama, Japan, $15.00 per ton of 2000 lbs., shipment not to consist of less than 400,000 lbs. and to be forwarded from New York on or before Sept. 29th, in accordance with shipping instructions given you by me and to be forwarded from Tacoma, Wash., *via* Northern Pacific steamer sailing from thence October 30th. Kindly forward your acceptance of the above as early as possible. Thanking you for the favor, I remain,

Yours truly, GEO. R. FITCH,
*G. E. Agent.*

The trading company wrote and sent in reply (accepting the proposition) the following letter:

September 20th, 1894.
The Northern Pacific R. R. Co., New York city.

DEAR SIRS: In reply to your esteemed favor Sept. 19th, we beg to accept the rate quoted to us in your letter of Sept. 19th, namely, on 200 tons pig lead, N. Y. to Yokohama, Japan, $15.00 per ton of 2000 lbs., shipment not to consist of less than 400,000 lbs., to be forwarded from N. Y. on or before September 29th, in accordance with shipping instructions to be given by you, and to be forwarded from Tacoma, Washington, *via* Northern Pacific steamer sailing from that port Oct. 30th. Kindly let us know as soon as possible the shipping instructions, so that we can forward them to our supplier, and oblige, with best respects,

Very truly yours,

THE AMERICAN TRADING CO.
(Signed) FRANK P. BALL.

On September 22, 1894, Fitch wrote and sent to the trading company the following letter, giving shipping instructions:

Northern Pacific Railroad Company.
Thomas F. Oakes, Henry C. Payne, Henry C. Rouse, receivers.
Geo. R. Fitch, general eastern agent, 319 Broadway.
TRAFFIC DEPARTMENT, NEW YORK CITY, September 22, 1894.

American Trading Co., No. 182 Front St., city.

DEAR SIR: I hereby confirm routing given you over the telephone yesterday on your shipment of pig lead for export to Yokohama, Japan, as follows:—To be shipped from Newark, N. J., *via* Penn. R. R. marked Anchor Line rail and Lake care Northern Pacific care A. O. Canfield, agent N. P. R. R., Tacoma, Wash. Please advise me as soon as possible who the shippers will be that I may order the cars and also see that same are rushed through without delay to connect with our steamer at Tacoma.

Yours truly,          GEO. R. FITCH, *G. E. Agent,*
A. H. P.

8. Before naming a rate for the transportation of the lead, Fitch had expressed some doubt as to whether it might not be excluded from transportation as contraband in view of the war then existing between China and Japan. In fact, the shipment of pig lead was not prohibited by the Treasury Department at Washington, during the war between China and Japan, and on September 25th, 1894, the trading company made another shipment of pig lead via Pacific Mail steamer sailing from San Francisco, which was, without trouble or delay, transported and delivered in Yokohama.

9. In September, 1894, J. B. Baird was the second assistant general freight agent of the receivers, and J. M. Hannaford was the general freight agent of the receivers; and telegrams of which the following are copies, relating to proposed shipments of pig lead, including the shipment in question, passed between the said Fitch and Baird and Hannaford, but were not disclosed to the American Trading Company:

NEW YORK, September 14, 1894.

J. B. Baird, second A. G. F. A.:

Please wire quick lowest rate one hundred ton lots pig lead from Chicago and Duluth to Yokohama.

GEO. R. FITCH.

September 14, 1894.

Geo. R. Fitch, 319 Broadway, New York, N. Y.:

You may quote as low as sixty cents from Duluth and seventy cents from Chicago to Yokohama on pig lead in one hundred ton lots. Get more if possible.

J. B. BAIRD.

NEW YORK, September 17, 1894.

J. B. Baird, 2d A. G. F. A.:

Your wire fourteenth. Shall I accept fifty cents on pig lead Duluth to Yokohama. Also name lowest rate on two hundred tons St. Louis to Yokohama.

GEO. R. FITCH.

September 18th, 1894.

Geo. R. Fitch, 319 Broadway, New York.

Cannot accept less than sixty cents on pig lead Duluth to Yokohama. Will quote from St. Louis later.

0.900.　　　　　　　　　J. B. BAIRD.　WDB.

September 19th, 1894.

G. R. Fitch, 319 Broadway, New York:

You may quote seventy cents on the pig lead in one hundred ton lots St. Louis to Yokohama. Advise if accepted.

0.900.　　　　　　　　　J. B. BAIRD.　WDB.

NEW YORK, September 21, 1894.

J. B. Baird, N. P. R'y, St. Paul, Minn.:

Wire best rate two hundred fifty tons pig lead Duluth to Shanghai.

GEO. R. FITCH.

September 22, 1894.
G. R. Fitch, 319 Broadway, New York:

N. P. Steamship Co. have now declined to handle lead for Yokohama, Kobe, Hong Kong or Shanghai. Please cancel your quotation.

0.900.                    J. B. BAIRD.   WDB.

On September 24, 1894, Fitch informed the trading company that he declined to ship the lead upon the ground that it might be contraband of war, and thereupon on the same day the trading company wrote him a letter stating that they would hold his company responsible for any loss from failure to fulfill the contract, which letter is as follows:

September 24th, 1894.
Geo. R. Fitch, Esq., general eastern agent N. P. R. R.,
    No. 319 Broadway, city.

DEAR SIR: Respecting your notice just received by us through your Mr. Post, that your company now decline to ship for us via Tacoma the 200 tons of pig lead specified in your contract with us under date Sept. 19th, and confirmed by us under date Sept. 20th, we beg to advise that we shall hold your company responsible for any loss or damage we may suffer from the non-fulfilment of this contract with you.

We remain, dear sirs,
            Very truly yours,
                    THE AMERICAN TRADING CO.
    (Signed)          WM. H. STEVENS, *Treas.*

Thereupon, telegrams of which the following are copies were sent and received as indicated, in relation to the shipment in question, but were not disclosed to the trading company:

NEW YORK, September 24, 1894.
J. B. Baird, N. P. R'y, St. Paul, Minn.:

Shipment lead to Yokohama is now being made shippers

refuse to accept withdrawal, we have given shippers written contract.

GEO. R. FITCH.

NEW YORK, September 24, 1894.

J. M. Hannaford, N. P. R'y, St. Paul, Minn.:

Have notified American Trading Co., that shipment will be refused. They state they will hold us to contract. They are shipping hundred tons from Denver to Yokohama by steamer City of Rio from San Francisco, Oct. fourth and expect to forward this shipment same way, will charge us difference in rate. Advice quick.

GEO. R. FITCH.

September 25, 1894.

G. R. Fitch, 319 Broadway, New York:

Your wire this date to Mr. Hannaford: Dodwell, Carlill & Co. have consented to accept the lead already contracted. Do not contract for any more. Advise quick number of pounds contracted by you and say how it will be routed. Think we should receipt for lead subject to delay.

0/900. J. B. BAIRD. WDB.

Dodwell, Carlill & Co., mentioned in the last telegram, represented the steamship company.

10. Thereupon the refusal to accept the shipment was withdrawn, and the shipment was made under the contract, and the lead, consisting of two hundred tons, was, in accordance with the shipping instructions given in Fitch's letter of September 22, 1894, shipped at Newark, New Jersey, on September 27th, 1894, by the Balbeck Smelting and Refining Company for the account of the American Trading Company. This was the first shipment ever made by the American Trading Company over the line of the Northern Pacific Railroad Company and its connecting carriers. The shipment was made in bond for exportation at Tacoma, and was secured upon the cars by Government locks and customs seals. On the after-

noon of September 27, 1894, the shipment left Newark, and started on its journey, and was transferred *via* the Anchor Line, a carrier operating between eastern points and points on the Lakes, to Duluth, and carried from Duluth *via* the receivers' railroad to Tacoma, which it reached in time for shipment by the steamship company's steamer, "Tacoma," sailing October 30, 1894. On September 28th, a cheque for the freight upon the lead from Newark to Yokohama was handed by the trading company to Fitch, of which cheque, with its endorsements, the following is a copy:

*Cheque.*

NEW YORK, September 28″, 1894.  No. 6096.
The National Bank of North America.
Pay to the order of the Northern Pacific R. R. $3360.05.
Thirty-three hundred and sixty & 05/100 dollars.

THE AMERICAN TRADING CO.
WM. H. STEVENS, *Treas'r.*

A. PROCTOR, JR.,
            *Cashier.*

The American Trading Co.

Endorsements.

For deposit in
     Ninth National Bank
          to Cr. of Geo. R. Fitch,
               Gen. east'n ag't.
Ninth Nat'l Bank,
     Endorsement,
          guaranteed
               of the City of N. Y.

The amount of the cheque was credited at the Ninth National Bank to the account of "George R. Fitch, General Eastern Agent," which was the style of the account opened by Fitch as agent of the Northern Pacific Railroad; and the account was never drawn upon in favor of the Northern Pacific Steamship Company, but all through freights received

were deposited to the credit of this account and remitted to the railroad company, or its receivers, and were divided and distributed by them under their contract with the steamship company.

11. On September 28, 1894, a shipping receipt for the shipment was issued to the Balbeck Smelting and Refining Company, of which shipping receipt a copy is hereto annexed marked Exhibit "B," and was delivered by the Balbeck Smelting and Refining Company to the American Trading Company, and was forthwith surrendered by the trading company to Fitch.

A bill of lading in the usual printed form, a copy of which is herein annexed marked "C," was subsequently issued by Fitch to the American Trading Company. It was received by a clerk of the trading company without stated objection to its terms, but was not read or examined by him or by any officer of the company, and was immediately hypothecated with the Hong Kong and Shanghai bank, as collateral security for moneys borrowed thereon by the trading company. The original of the bill of lading was negotiable, and did not have stamped upon it the words "not negotiable, shippers copy," which appear on the shipper's copy hereto annexed, but was similar to the shipper's copy in all other respects.

On September 29th, 1894, Fitch sent a copy of this bill of lading to Dodwell, Carlill & Co., with a letter (not disclosed to the American Trading Company) of which the following is a copy:

Northern Pacific Railroad Company.

Thomas F. Oakes, Henry C. Payne, Henry C. Rouse, receivers.

George R. Fitch, general eastern agent, 319 Broadway.

TRAFFIC DEPARTMENT, NEW YORK CITY, Sept. 29, 1894.

Dodwell, Carlill & Co., Tacoma, Wash.

GENTLEMEN: I hand you herewith my B/L 1507 covering shipment of pig lead for export to Amer. Trading Co. Yokohama, Japan. As I have previously advised you, I have made

contract guaranteeing delivery of this shipment at Yokohama by our S. S. Tacoma sailing Oct. 30th. Will you kindly see that this connection is made without fail.

Yours truly,

(S'g'd)                                    GEO. R. FITCH, *G. E. A.*

The previous letter of advice referred to by Fitch in the foregoing letter is lost and no copy of it exists. It appears, however, from the following letter of acknowledgment to have borne date on September 27th:

TACOMA, WN., October 2nd, 1894.

George R. Fitch, Esq., G. E. A., N. P. R. R., 319 Broadway, New York.

DEAR SIR: We beg to own receipt of and thank you for your favor of the 27th ultimo, and advising the engagement of 40 tons of condensed milk and 225 tons of pig lead for our steamer "Tacoma," sailing hence the 30th instant. Please keep us frequently advised of freight engagements, as we have applications now for more space for flour than our steamers will carry, and we are shutting out considerable of the latter every voyage.

Yours truly,

(Sig.)                          *p. p.* DODWELL, CARLILL & Co.

A. T. PRITCHARD.

12. At Tacoma the lead was delivered by the receivers to the Northern Pacific Steamship Company and was loaded upon the "Tacoma," the vessel of the steamship company which was to sail on October 30; but about four o'clock in the afternoon of that day the deputy collector of the United States at that port refused to clear the vessel while the lead was on board upon the ground that it was contraband of war, and telegraphed to the collector of Port Townsend for instructions. On the following day, which was the thirty-first of October, the deputy collector at Tacoma received a telegram

from the collector of the United States at Port Townsend, which was as follows:

Department advises that unless you have evidence tending to show that the pig lead at Tacoma and referred to in your telegram of yesterday is to be used in the war between China and Japan, no reason is perceived why shipment should not be permitted.

In the meantime, however, the master of the vessel unloaded the lead, which delayed the ship until 9 A. M. on the morning of October 31, when he sailed without it.

The petitioner was not notified of the delay in the transshipment of the lead until November 5, 1894.

The next vessel on the line was the "Sikh," which did not belong to the steamship company, but was a chartered ship. Her captain declined to take the lead on the ground that it was contraband. The Northern Pacific Steamship Company cabled to the owners of the vessel in London, and they adhered to the position taken by the captain.

13. The lead went forward on the next vessel, the "Victoria," on December 11, 1894, and did not arrive in Yokohama until on or about January 4, 1895, instead of on or about November 18, 1894, when it would have arrived had it gone forward on the thirtieth of October, 1894.

14. In the meantime hostilities between China and Japan had ceased, the price of lead had fallen very considerably, and the purchaser of the shipment refused to accept it and declared the contract null and void in consequence of the failure to deliver it promptly in accordance with the terms of the contract.

15. The price of the lead under the contract would have been $38,610.17. The lead was delivered to the trading company in Yokohama upon the surrender of the bill of lading, and in consequence of the failure of its vendee to accept the lead, the trading company sold it for $11,331.60, which was the best price obtainable therefor, at the time of the sale. The sale was made as soon as a purchaser could be found.

The value of the lead on January 4, 1895, in Japan, was $11,906.16.

16. Upon the case arising on the foregoing facts, the American Trading Company has duly presented to the receivers and to the Northern Pacific Railway Company, its claim amounting to the sum of $26,704.02, with interest thereon from the 4th day of January, 1895, and has demanded payment thereof, but payment has been refused, and no part thereof has been paid.

*Mr. Charles W. Bunn* for appellants:

The damages were due solely to delay after delivery to the connecting carrier and the receivers were not responsible for such damage. *Myrick* v. *Mich. Cent. R. R. Co.,* 107 U. S. 102; *Taylor* v. *Maine Central R. R.,* 87 Maine, 302; *Burroughs* v. *Norwich & Worcester R. R. Co.,* 100 Massachusetts, 26; *Washburn & Moen* v. *Prov. & W. R. R. Co.,* 113 Massachusetts, 490.

There is no proof that the court had authorized the receivers to transport goods beyond their own lines or to guarantee the transportation by other carriers, and in the absence of such authorization such contracts were beyond their power. *Chicago Dep. Vault Co.* v. *McNulta,* 153 U. S. 554. Making such guarantees is not part of the necessary or usual business of operating a railroad.. *Int. & Gt. Nor. R. R. Co.* v. *Wentworth,* 87 Texas, 311; *Green Bay & Minn. R. R.* v. *Union Steamboat Co.,* 107 U. S. 98; *Railway Companies* v. *Keokuk Bridge Co.,* 131 U. S. 371, 385; *Swift* v. *Pac. Mail S. S. Co.,* 106 N. Y. 206, 216. If the general agent made any such contract he exceeded his authority.

The bill of lading is the final and only contract and under it the receivers were not liable beyond their own lines. *Seitz* v. *Brewers' Refrigerating Co.,* 141 U. S. 510; *De Witt* v. *Berry,* 134 U. S. 306. As to being issued after the shipment of the goods the cases cited by appellee do not apply; and see *Shelton* v. *Merchants' Despatch,* 59 N. Y. 258; *Hill* v. *Syracuse &c.,*

73 N. Y. 351; *Germania Fire Ins. Co.* v. *Memphis & Charleston R. R. Co.*, 72 N. Y. 90; *Rubens* v. *Ludgate Hill S. S. Co.*, 20 N. Y. Supp. 481.

The bill of lading was not imposed on an ignorant or unskillful man, the shipper knew he was to receive a bill of lading and received it forthwith after the shipment, really simultaneously with it; it expressed the usual carrier's liability and was not an attempt to lessen it; the shipper assented to its terms by immediately negotiating it at the bank.

The collector's action in refusing to allow the vessel to carry the lead made the performance of the contract not only impossible, but unlawful, and absolved the carrier on whose part there was no fault. The collector was an officer of the United States and had authority even if he erred as it was likely it would have been an offense for the vessel to sail without a clearance. Rev. Stat. § 4197; *Brewster* v. *Kitchell*, 1 Salk. 198; *Bailey* v. *DeCrespigny*, L. R. 4 Q. B. 180; Leake on Contracts, 497, 501; *Nickoll* v. *Ashton*, 2 K. B. 1901, 126. Congress having provided no method of reviewing the collector's decisions it intended them to be obeyed; the ship could not be delayed for a law suit and Federal courts could not mandamus the collector. *McIntyre* v. *Wood*, 7 Cranch, 504; *Bath County* v. *Amy*, 13 Wall. 244; *Davenport* v. *Dodge County*, 105 U. S. 237; *Louisiana* v. *Jumel*, 107 U. S. 711, 727; *Rosenbaum* v. *Bauer*, 120 U. S. 450; *Graham* v. *Norton*, 15 Wall. 427. There is no remedy against the collector on his bond for error in the exercise of his discretion. *Kendall* v. *Stokes*, 3 How. 87; *Otis* v. *Walkins*, 9 Cranch, 339; *Crowell* v. *McFadon*, 8 Cranch, 94; *Otis* v. *Walter*, 2 Wheat. 18; *Martin* v. *Mott*, 12 Wheat. 31; *Wilkes* v. *Dinsman*, 7 How. 89, 132; *Gould* v. *Hammond*, 1 McAll. 235. Acts of Congress forbid the sending of troops, munitions of war, guns, warships and war implements to a nation at war with a friendly power. Rev. Stat. § 5281 *et seq.* And clearance should be refused to a ship violating these or any other laws of the United States. Rev. Stat. §§ 3987. 4200, 4202, 4539, 4573.

The ship could not have sailed from Tacoma, or probably have entered any port in Japan, without a clearance. Abbott on Shipping, 9th ed., 288; Lushington Naval Prize Law, 24–34.

*Mr. F. B. Jennings,* with whom *Mr. Howard Van Sinderen* was on the brief, for appellee:

The contract contained an absolute agreement to ship from Tacoma by steamer sailing on or about October 30. This is evidenced by the correspondence and the receivers ratified the contract. The railroad company can make a contract for transportation beyond its own line. Elliott on Railroads, § 1434, and cases cited; Redfield on Railways, §§ 189, 191, and cases cited; Hutchinson on Carriers, §§ 151, 152; *Ogdensburg &c. R. R. Co. v. Pratt,* 22 Wall. 123; *Railroad Co. v. McCarthy,* 96 U. S. 258.

The receivers had the same authority as the carrier itself. Elliott on Railroads, § 567; Hutchinson on Carriers, § 67a; Beach on Receivers, § 371; *Cent. Trust Co. v. N. Y. City & Nor. R. R.,* 110 N. Y. 257; *Little, Receiver, v. Dusenberry,* 46 N. J. Law. Rep. 614; *Wall v. Platt,* 169 Massachusetts, 400; *Kansas Pacific v. Bayles,* 35 Pac. Rep. (Colo.) 744; *Chicago Dep. Vault Co. v. McNulta,* 153 U. S. 554, distinguished. The contract was within the authority of the general eastern agent of the receivers.

The real authority of an agent is equal to his apparent authority, and he can make any contract relative to the business under his management which could be made by his principal. *Insurance Co. v. Wilkinson,* 13 Wall. 222, 235; *Goldwater v. Liverpool &c. Co.,* 39 Hun, 178; *S. C.,* affirmed 109 N. Y. 618; *Pechner v. Phœnix Ins. Co.,* 65 N. Y. 195; *Lowenstein v. Lombard, Ayres & Co.,* 164 N. Y. 324; *Isaacson v. N. Y. C. & H. R. R. R. Co.,* 94 N. Y. 278, 285; *Talcott v. Wabash R. R. Co.,* 159 N. Y. 461, 469; Porter on Bills of Lading, § 159; Hutchinson on Carriers, § 267.

A general freight agent can contract for the carriage of goods beyond the carrier's line. Ray on Negligence of Imposed

Duties, 400; *White* v. *M. P. R. Co.*, 19 Mo. App. 400; *Grover & Baker Sewing Mach. Co.* v. *Mo. Pac. R. R. Co.*, 70 Missouri, 672. He can stipulate for carriage within a specified time. *Strohm* v. *Detroit &c. R. R.*, 23 Wisconsin, 126; *Goddard* v. *Mallory*, 52 Barb. 87; *Goodrich* v. *Thompson*, 44 N. Y. 324.

The contract was not merged in or modified by the bill of lading. This could not be done without consent of both parties. *Wheeler* v. *Railroad Co.*, 115 U. S. 340. The receipt of the bill did not constitute such consent. *Bostwick* v. *Balt. & Ohio R. R. Co.*, 45 N. Y. 712; *Mo. Pac. Ry. Co.* v. *Beeson*, 30 Kansas, 298; *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 319, 329; *Pollard* v. *Vinton*, 105 U. S. 8; *Gaines* v. *Union Transport Co.*, 28 Ohio St. 418; *Swift* v. *The Pacific Mail S. S. Co.*, 106 N. Y. 206; *Mobile &c. R. R. Co.* v. *Jurey*, 111 U. S. 584; *Park* v. *Preston*, 108 N. Y. 434; *Gillaume* v. *Gen. Transptn. Co.*, 100 N. Y. 491; *Strohm* v. *Detroit and Milwaukee Ry. Co.*, 21 Wisconsin, 545; *King* v. *Woodbridge*, 34 Vermont, 565; Hutchinson on Carriers, §§ 246, 247; *McAbsher* v. *Railroad Co.*, 12 S. E. Rep. 892; *Hamilton* v. *Railroad Co.*, 96 N. Car. 398; *Central R. R. Co.* v. *Dwight Mfg. Co.*, 75 Georgia, 609; *Baker* v. *Mich. S. &c. R. R. Co.*, 42 Illinois, 73; *Merchants' Dispatch Tr. Co.* v. *Furthmann*, 149 Illinois, 66.

The failure to perform was not excused by the unlawful refusal of the deputy collector to clear the ship with the lead on board. That the action was unlawful is conceded. Treasury Decisions, August, 1865–1883; *Hendricks* v. *Gonzales*, 67 Fed. Rep. 351; *Evans* v. *Hutton*, 12 L. J. C. P. N. S. 17.

The collector was liable for the damages sustained by the vessel and the owners could have recovered on his bond. Rev. Stat. 989; *Schell* v. *Cochran*, 107 U. S. 625; *Cruikshank* v. *Bidwell*, 176 U. S. 73, 81; *United States* v. *Sherman*, 98 U. S. 565. The receivers having made the contract should have ascertained what the law was prior to the arrival of the lead at Tacoma, or they should have held the vessel until the telegrams sent to the collector were answered. *Williams* v. *Vanderbilt*, 28 N. Y. 217, 223. Impossibility of performance

arising subsequently to making of the contract constitutes no defense. *Jacksonville* v. *Hooper*, 160 U. S. 514, 527; Hutchinson on Carriers, § 317; *Jones* v. *United States*, 96 U. S. 24, 29; *Robson* v. *Miss. Logging Co.*, 61 Fed. Rep. 900; *S. C.*, 69 Fed. Rep. 777; *The Harriman*, 9 Wall. 161; *Parine* v. *Jane*, Aleyn Sel. Cas. 26; *Beebe* v. *Johnson*, 19 Wendell, 500; *Blight* v. *Page*, 3 Bos. & Parl. 295; *Barker* v. *Hodgson*, 3 Marle & S. 271; *Ashmore* v. *Cox*, 1 Q. B. Div. 1899, 436; *Meredos* v. *Hill*, 8 Bingham, 235; 1 Parsons on Contracts, 566, and cases cited; Story on Contracts, § 1334; *C., M. & St. P. Ry.* v. *Hoyt*, 149 U. S. 1; *Railroad Co.* v. *Baker*, 98 Fed. Rep. 694, distinguished.

The failure to fulfill the contract was due to the negligence of the receivers, who failed to exercise the degree of diligence in the interest of shippers which the law requires. *The M. M. Chase*, 37 Fed. Rep. 708; Hutchinson, §§ 188 *et seq.; Robinson* v. *M. & C. R. R. Co.*, 16 Fed. Rep. 57, 69; and even though the steamship company was the negligent party the receivers were liable under the contract. *O. & M. R. Co.* v. *McCarthy*, 96 U. S. 258; *Ogdensburg &c. R. R. Co.* v. *Pratt*, 22 Wall. 123.

The measure of damages is the difference between the contract price for the sale of the lead in Japan and the market price at the date of arrival with interest, as decided by the court below. *The Caledonia*, 50 Fed. Rep. 567; *S. C.*, 157 U. S. 124, 139; *Schwarzchild* v. *Natl. S. S. Co.*, 74 Fed. Rep. 257; *Railroad* v. *Estill*, 147 U. S. 591, 616; *Railway Co.* v. *Jurey*, 111 U. S. 585; *The Nith*, 36 Fed. Rep. 86; *S. C.*, affirmed, 36 Fed. Rep. 384; *Messmore* v. *N. Y. Shot & Lead Co.*, 40 N. Y. 422; *Booth* v. *Spuyten Duyvil R. M. Co.*, 60 N. Y. 487.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

The objections to the recovery herein, made on the argument, were:

(1.) That no contract was shown on the part of the receivers to assume any responsibility for the transportation of the lead beyond the line of the railway in their charge.

(2.) That there was no proof that the court had authorized the receivers to assume any such responsibility, and they could not do so without any such authority.

(3.) That if Fitch, the agent, made such agreement it was not within his authority, real or apparent.

(4.) That the bill of lading is the controlling contract, and by its terms the receivers were not liable beyond their own line.

(5.) That the damages were caused solely by the act of the collector, representing the authority of the United States, and the receivers are not liable for damages so caused.

In regard to the first objection, we think the facts agreed upon clearly show a special agreement for the transportation of the lead to Yokohama by the steamship of the Northern Pacific Steamship Company, which was to leave Tacoma on October 30, 1894. The opening of the negotiation was made by the American Trading Company, which applied to Fitch for a rate upon the proposed shipment from New York to Yokohama, Japan. The trading company knew nothing of his steamship agency, and he was informed that it was of vital importance that the lead should be transported promptly and go forward by the earliest possible steamer without delay, in order to enable the trading company to fulfill a proposed agreement which it was about to make for the sale of the lead in Japan, and which would require its delivery there at a fixed date. Fitch thereupon named a rate, and undertook to forward the lead from New York to Yokohama, on or before September 29, *via* the Northern Pacific steamer sailing from Tacoma October 30, 1894. The trading company thereupon made its proposed agreement through its agents at Yokohama. Although Fitch, the agent, was not thereafter specially informed of the fact that the proposed agreement had been made, yet he was informed that the company intended to make it if a rate could be agreed upon for the transportation of the lead, it is clear that his furnishing of the rate was with reference to the proposed agreement,

and that he understood that if his terms were accepted he was entering into an agreement to transport to Japan the lead in question over the Northern Pacific Railroad to Tacoma, and by the steamship which would leave Tacoma on October 30, 1894. His letter of September 19, 1894, to the trading company, confirming the rate, is a plain agreement, not alone to deliver the lead in time for the sailing of the steamer, October 30, but an agreement that the lead should be forwarded from Tacoma, Washington, *via* the Northern Pacific steamer sailing on that day. Fitch in that letter asked the trading company to forward their acceptance of this proposed agreement as early as possible. On the next day, September 20, the trading company, by letter, did accept the rate "for a shipment of pig lead, to consist of not less than four hundred thousand pounds, to be forwarded from New York to Tacoma, and from Tacoma *via* the Northern Pacific steamer sailing from that port October 30." There is no doubtful expression in these letters. They form a clear and specific contract. It is entirely different from *Myrick* v. *Michigan Central Railroad Company*, 107 U. S. 102. The receipt in that case was plainly not one which established a contract for transportation on the part of the railroad company (defendant) beyond its own line. This court held that while a company might by a contract to that effect be held liable for the transportation and delivery of freight beyond its own line, yet the contract to do so must be clear, and that the mere stating of a through fare on the receipt of the freight does not establish such contract or liability.

In the case at bar we hold that a special agreement is set forth in the statement of facts, to forward to Yokohama by the steamer leaving Tacoma on October 30, 1894. If it had been made by the proper officer of a railroad company in the general course of business, we have no doubt, under the authorities, of the validity of the contract. *Railroad Company* v. *Pratt*, 22 Wall. 123; *Railway Company* v. *McCarthy*, 96 U. S. 258; *Myrick* v. *Michigan Central Railroad Company*, 107 U. S.

102. Whether the fact that it was made by an agent of the receivers of a railroad company makes any difference will be discussed later.

Appellant urges, however, that as Fitch was also agent for the steamship company, his contract, if there was one, to forward by the steamship sailing October 30, was in behalf of the steamship company. Fitch had never received any direct or independent appointment or authority from the Northern Pacific Steamship Company to act as its agent. His only authority as agent of that company was created by the contract made between the two companies. By that agreement the railroad company was to have the exclusive right (with certain exceptions) to appoint agents in the United States, etc., and the steamship company thereby authorized the railroad company and its appointed agents to act as agents for the steamship company, and to issue bills of lading and passenger tickets, and to make and name rates on all traffic for Asiatic points, etc. The trading company did not know what company operated the steamships between Tacoma and Yokohama, or that the steamship company was a separate and independent company, or that there was any contract between the receivers and the steamship company. When the trading company, therefore, applied to Fitch for a rate, they applied to him as the agent of the receivers of the railroad company. The letter of Fitch of September 19, confirming the rate already given orally that day, is written on the paper used by the receivers of the railroad company, which paper is headed by the names of the receivers under the words "Northern Pacific Railroad Co.," and in it Fitch describes himself as "general eastern agent," and his department as the "Traffic Department in New York City," and he signs his name and adds the words "G. E. Agent." In his letter of September 29, 1894, to the steamship agent at Tacoma, Washington, he writes on the same kind of paper, with the same heading, and describes himself as "general eastern agent," and in the letter he says "As I have previously advised you I have made contract

guaranteeing delivery of this shipment at Yokohama by our S. S. Tacoma sailing October 30. Will you kindly see that this connection is made, without fail." He signs his name and adds the letters G. E. A., meaning, of course, thereby "general eastern agent." It is contended that by the statement of facts it appears that Fitch was acting for two principals, and that the plaintiff must establish that Fitch made the alleged guaranty on behalf of the receivers. We do not think he was acting in behalf of two principals. From all the facts we think it plain that he was acting for the receivers of the railroad company. He was their general eastern agent; he was applied to and he made his rates as such, and as such he signed the letter confirming those rates and containing the agreement to forward the lead on the steamship as already stated. Subsequently, and on the twenty-ninth of September while acting and signing himself as the general eastern agent of the receivers, he writes to the steamship agents at Tacoma the letter in which he says he has guaranteed delivery at Yokohama by our steamer sailing October 30. All this shows the fact that he was acting as agent for the receivers.

We have no difficulty in determining the capacity in which Fitch acted, nor that he made the special agreement, as contended by the trading company.

(2.) Neither do we doubt that the court had authorized the receivers to make such a contract.

Under the modern methods of foreclosing railroad mortgages it has been the custom to appoint receivers to take charge and conduct the business of the railroad mortgagor, during the pendency of the suit. The possession of such receivers frequently lasts for years. It would be in the highest degree disadvantageous to all interested in the railroad company, as well as to the public having occasion to do business with it, if the same power which the company possessed to make special contracts for transportation should not be given to and exercised by the receivers of the company in continuing to run the road in substance as a going concern, so far as these

kinds of contracts are concerned. Such contracts are not of the character spoken of by Mr. Justice Jackson in *Chicago Deposit Vault Company* v. *McNulta*, 153 U. S. 554, as so extraordinary or unusual as not to be included in the authority to carry on the business of the company. On the contrary, this contract is one of that class which we regard as so included.

(3.) We are also of opinion that Fitch had the right to make the agreement in question, and if there could be any doubt on that point, nevertheless the agreement was in fact thereafter ratified by the officers representing the receivers, who had power so to do. *Goodrich* v. *Thompson*, 44 N. Y. 324.

A railroad company has the power, as we have seen, to make such a contract of carriage beyond its lines. A general agent would be presumed to have such power. If the company have the power some individual must exercise it. It would not be supposed that the board of directors would be consulted and authority given by it every time such a contract was to be made. Who is a more proper or fit person to make the contract than the general agent of the company? He must necessarily have large powers in order to conduct the business of his office, and, *prima facie* such power is within the scope of such agency. When the railroad company passes into the hands of a receiver, appointed by the court in a foreclosure suit, and the receiver is directed to conduct and continue the business of the company, the power to appoint general agents necessarily goes with the order to conduct the business of the company, and when the general agent is appointed by a receiver he will be presumed to have the general powers of such an officer when acting for the railroad itself. The words "General Eastern Agent" for a Western railroad company only limit the exercise of the agency to the place so described.

(4.) It is urged that the bill of lading constitutes the sole contract. But there was a plain valid contract existing between the parties before the lead was shipped and before any bill of lading was issued. That special contract was to for-

ward the lead by the steamship leaving Tacoma on October 30. The next day after the lead was shipped at Newark, a bill of lading was delivered to one of the clerks of the trading company, and that bill of lading contains the absolutely inconsistent statement that the carrier is not to be liable for any loss not occurring on its own road, and that the contract as executed is accomplished and all liability thereunder terminates upon the delivery of the property to the steamship.

It is said that the trading company, by receiving this bill of lading and obtaining money on it as the representative of the property therein described, has acquiesced in the total abolition of the special contract the company made with Fitch, and has agreed that the railroad company shall be under no liability after the delivery of the lead to the steamship.

We regard it as entirely clear that no such effacement of the original contract was meant by the receipt of the bill of lading. The railroad company has no power alone to alter that contract, and it could not alter it by simply issuing a bill of lading, unless the other party assented to its conditions and thereby made a new and different contract.

At the time when the bill of lading was issued the lead had been shipped at Newark and had departed for its destination. It was impossible for the trading company to recall it. The particular conditions in the bill are set out in subdivision three and subdivision twelve of the conditions printed in small type and they form part of numerous other printed conditions in regard to the freight received.

Where the acceptance of the bill of lading, under these circumstances, is sought to be made an equivalent to an assent to the change of contract, it is proper to look at these facts in order to determine what weight should be given to such acceptance. At the time it was received the lead was out of the possession of the trading company, on its way West. That company needed the bill of lading as evidence of title to the property described in it, upon the security of which it

desired to raise money, which it could not do without the possession of the bill. Under these circumstances we refuse to hold that the trading company, in accepting the bill of lading, thereby consented to the complete alteration of its original contract, and, without any consideration whatever, agreed to release the railroad company from all liability on that contract and to take in its stead the reduced liability provided for in the bill of lading.

Of course the company expected a bill of lading, for such an instrument is the usual accompaniment in shipping merchandise. The bill showed the amount of the lead, the marks and numbers, etc., and so identified the goods as to enable the shippers to show their amount and general value, and to enable them to negotiate the bill and obtain money on its security.

It is agreed in the statement of facts that this bill of lading was received by a clerk of the trading company without stated objection to its terms, but was not read or examined by him or by any officer of the company, and was immediately hypothecated with a bank as collateral security for the money borrowed thereon by the trading company. We do not state the fact that the bill of lading was not examined, for the purpose of insisting that an examination of such an instrument must always be shown before a contract can be predicated thereon. But where there is a valid contract already in existence, and it is urged that such contract has been abrogated or changed by the receipt of a bill of lading, after goods have passed from the control of the shipper, we think it is important, upon the question of whether such original contract has, in fact, been abrogated, to show that the bill was never read in fact; that the conditions abrogating the original contract were among a number of other conditions printed in the bill in smaller type than the rest of the bill, and that the alleged acquiescence of the trading company in the change of the contract, by virtue of these conditions, is based upon the mere reception of the bill of lading by a clerk without any knowledge of the existence of these conditions and without evidence

of any authority in him to consent to a modification of the contract already made by his employer. The fact that, in such ignorance, that company hypothecated the bill of lading, adds nothing to the alleged acquiescence. What the contract meant as between the railroad company and the bank or other assignee of the bill of lading is not important here, but upon these facts we are unable to see that the receipt and holding of the bill of lading changed the original contract as claimed by the railroad company. See *Bostwick* v. *Railroad Company*, 45 N. Y. 712, where it was held, under the circumstances of that case, the mere acceptance of a bill of lading did not alter a previously made oral contract in relation to the shipment.

(5.) Even if the receivers of the railroad company contracted to forward the lead by the steamer sailing from Tacoma, October 30, it is still insisted that the action of the deputy collector, at Tacoma, in refusing to grant a clearance to the steamship while the lead was on board, made the performance of the agreement not only impossible but unlawful, and for that reason the receivers were absolved from their agreement to forward by that vessel. The contract was not unlawful when made. It may be assumed that the lead was contraband of war, but that fact did not render the contract of transportation illegal nor absolve the carrier from fulfilling it. It is legal to export articles which are contraband of war, but the articles and the ship which carries them are subject to the risk of capture and forfeiture. *The Santissima Trinidad and the St. Ander*, 7 Wheat. 283, 340. Neither any law of the United States nor any provision of international law was violated by the making of this contract, nor by an attempt to export the lead pursuant to its provisions. The case does not come within the principle of *Brewster* v. *Kitchell*, 1 Salk. 198, where it was said that if one covenants to do a thing which is lawful, and an act of Parliament comes in and hinders him from doing it, the covenant is repealed.

No act of Congress was passed, subsequently to the making

of the contract, which made it unlawful, and it was lawful when made. It is true that the sailing of the vessel without a clearance would have been unlawful, and the deputy collector refused to grant that necessary document while the lead was on board the steamship. But that did not render unlawful the contract to transport. He had the power to refuse to grant the clearance, and he did refuse unless the lead were taken off. In so doing he undoubtedly violated his duty. He was not justified in exacting any such condition for granting the clearance.

Upon the facts in this case we are of opinion that this refusal of the deputy collector constituted no defense to the action on the contract. It is not within the exception referred to by Mr. Justice Jackson, in delivering the opinion of the court in *Chicago, Milwaukee & St. Paul Railway Company* v. *Hoyt,* 149 U. S. 1. This contract, in view of all the facts, we think was made in contemplation of trouble arising from the character of the lead as contraband of war.

The statement of facts shows that the question of whether the lead might not be excluded from transportation as contraband in view of the war then existing between China and Japan, was fully understood before the contract was made, and after it was made and the steamship refused to carry the lead, the trading company, upon being so informed by Fitch, notified him that they would hold the receivers responsible for failure to fulfill the contract, and thereafter, with the attention of all the parties directed to the subject, it was finally agreed that the lead should be received and transported, and the refusal was then withdrawn.

It is true that the special and particular difficulty was first made by the steamship company which refused to transport the lead, yet, still, the attention of all the parties was, from the very first, directed to the peculiar character of the freight as contraband of war, and whether the contract should on that account be made, or, having been made, whether the shipment should not be refused. The receivers, therefore, knew

that there might be difficulty in relation to the transportation, and yet, after full knowledge on the subject, they agreed to and did withdraw their refusal, and they thereupon took the lead for transportation under the contract.

Under these circumstances it ought not to be held that the mistaken action of the deputy collector in refusing to give the clearance should operate as an excuse for the non-performance of the contract, which was not thereby rendered illegal. It cannot be affirmed that such possible refusal was not within the contemplation of the contracting parties when the contract was made. Many causes, it was known, might operate to obstruct the transportation of articles contraband of war. This particular form of impediment may not have been actually within the minds of the parties to the contract, but there was, as the agreed facts show, present to their minds the fact that there might be trouble in procuring the transportation of the lead, because of its character as contraband of war, and in the light of those facts the contract was made and, in substance, ratified after it was made. The railroad receivers took the risk of this, as of other obstructions, in making the contract, and they ought to be held to it.

As the act of the deputy collector was an erroneous one and a clearance should have been given while the lead was on board the steamship, we think his refusal should not be at the expense of the shippers who had obtained this contract for transportation while all parties actually knew the difficulties that might concern the exportation of the lead from Tacoma. The State had not intervened to prevent the performance of the contract, as was the case in *Touteng* v. *Hubbard*, 3 B. & P. 291, where Lord Alvanley held that in such circumstances the party will be excused. In that case there was an embargo laid by the British Government, after the contract was made, on all Swedish vessels.

Here there was no intervention of the Government of the United States. The exportation of lead was never prohibited by the Treasury Department during the war between China

and Japan. There was no change in the law or the policy of this Government subsequently to the making of the contract, by which its performance was excused. The exportation of the lead was legal when the contract was made and continued to be so after the execution of such contract, although the deputy collector mistakenly refused to grant the clearance unless the lead was taken off the vessel. Such mistaken decision did not render the original loading of the lead on the ship unlawful, nor would it have been unlawful for the ship to proceed with the lead on board provided the clearance had been had. It was not an act of the State, therefore, which prevented the sailing of the vessel within the true meaning of such a term, but a mistaken act of a subordinate official not justified by law and not sufficient as an excuse for the non-performance of the contract in question under the circumstances already detailed. If the bill of lading were regarded as applicable for this purpose, the refusal of the clearance did not constitute a "restraint of princes, rulers or people," within that clause of the bill.

It was one of the contingencies of which the receivers undertook by their special contract of transportation to take the risk. It was not a contract that they should violate the law, but they took the risk of its misapplication, believing, of course, that such contingency was most remote and that if the steamship company would receive the lead for transportation the chief obstacle to the fulfillment of the contract would be thereby removed.

After the lead had been unshipped, and within half an hour after the sailing of the vessel, the telegram which the deputy collector had sent to the collector in regard to the matter was answered by the latter in such terms that, undoubtedly, if the ship had been still in port, the lead would have been placed thereon and transported to Japan. The master, however, as soon as the determination of the deputy collector was given, immediately and without appealing to the collector, unshipped the lead and sailed for his destination at once.

The result of the failure thus to carry the lead on that vessel was that it did not arrive in Yokohama until on or about January 4, 1895, instead of on or about November 18, 1894, which it would have done had it gone forward as contracted for. In the meantime, the war between China and Japan ceased, the value of the lead fell, and the trading company was damaged as stated in the finding of facts.

We think the objections made to this recovery are untenable, and the decree of the court below is, therefore,

*Affirmed.*