## AMBLER et al. v. BLOEDEL DONOVAN LUMBER MILLS.

### No. 13258.

District Court, W. D. Washington, N. D.
Dec. 12, 1932.

John Ambler and Grosscup & Morrow, all of Seattle, Wash., for libelants.

William Harrison Abbott, of Bellingham, Wash., and Bogle, Bogle & Gates, of Seattle, Wash., for respondent.

NETERER, District Judge.

The Dimon Steamship Corporation, prior to insolvency, was engaged as a common carrier of lumber between the Puget Sound and Atlantic Coast ports. The respondent is a corporation engaged in the manufacture and shipping of lumber on Puget Sound. The steamship company operated the Pacific Hemlock, the Pacific Pine, Pacific Cedar, and Pacific Oak. The Pacific Hemlock was due to arrive on Puget Sound during the middle part of October, 1931; the other ships at different times in November; all were without return cargo commitments. The market and economic conditions curtailed operation of Pacific Coast mills, resulting in large surplus in space of lumber carrying vessels, beginning before September, and particularly emphasized in October and November, in intercoastal trade. Carriers in intercoastal shipping, while openly maintaining east-bound rates, privately sought cargo at available rate, and there was much negotiation between the shippers and carriers. On one ship the instant shipper obtained a $9 rate (September). The testimony does not disclose other commitments during this time, but the testimony does not show that the rate was being maintained.

▇ The objection to the interoffice correspondence must be sustained. It is hearsay as to the respondent.

In October 13, 1931, the shipper and the carrier entered into a contract by which a cargo of lumber was furnished by the shipper to the Pacific Hemlock for $8 per thousand for lumber sold on delivery in New York, and for lumber sent "in transit" for storage in New York, unless sold prior to arrival. The steamship company was to grant the shipper 30, 60, and 90 days' time on the payment of the freight, except upon cargo which was consigned; the steamship was to collect the freight from the consignee on sold shipments, the lumber sold C. I. F. (cost plus interest plus freight). The bill of lading noted $10 freight rate, to be collected from the consignee on sold cargo, the steamship to apply $8 per thousand to the freight on consigned cargo, and credit the shipper with $2 per thousand on its freight account, retaining the $2 as an operating fund until the freight account was settled. Negotiations for cargo were carried forward for the Pacific Pine, Pacific Cedar, and Pacific Oak, due to arrive in November, the shipper endeavoring to obtain a $6 per thousand rate. On November 2, 1931, a contract was agreed to and consummated, which provided, as far as material: "All details surrounding these three vessels to be the same as the Steamship Pacific Hemlock."

On the 16th of October, 1931, a carriers' agreement was signed by thirteen, providing, as far as material " * * * That each of such carriers shall from this date up to and including October 31, maintain a $10.00 for one thousand feet net board measurement rate from Pacific Coast to Atlantic Coast. * * *" This was approved by the Shiping Board October 21. The vessels commenced taking cargo and sailed, as follows: The Pacific Pine, November 6, and sailed November 17; the Pacific Cedar, November 20, and sailed November 28; the Pacific Oak, November 30, and sailed December 12.

On November 16, 1931, a carriers' agreement signed by fourteen on November 13 was filed with the United States Shipping Board November 18, and provides that they would not quote or book lumber at less than $9 per thousand feet, b. m., "from this date until December 31, 1931." The carriers filed, and the Shipping Board approved, the agreements pursuant to section 814, title 46 USCA, and from the date of approval became a regulatory tariff within the limited period for carriers of lumber from Puget Sound to the Atlantic Coast.

▇ The conclusion appears inevitable that the agreement contended for by the respondent with the Pacific Hemlock was entered into and the booking was complete, and is not within the carriers' agreement of October 16, approved October 18, nor contrary to any

442

other maintained tariff. The carriers' agreement ended October 31, except as to inhibition against quotations for commitments for November, December, and January following. While it is obvious that negotiations were carried forward, the $8 rate was quoted prior to the October agreement. By the negotiations it appears that the shipper endeavored to secure a lesser rate. There were no quotations or commitments during the inhibited period, but thereafter, on the 2d day of November, the $8 rate was agreed to for the three other vessels, and the commitment for the three vessels was wholly closed prior to the November carriers' agreement; nor did the notation, "$10.00," on the bill of lading, control. Toyo Kisen Kaisha v. W. R. Grace & Co. (The Tokuyo Maru) (C. C. A.) 53 F.(2d) 740, 1932 A. M. C. 34; Mobile & Montgomery R. Co. v. Jurey, 111 U. S. 584, 4 S. Ct. 566, 28 L. Ed. 527; Northern Pacific R. Co. v. American Trading Co., 195 U. S. 439, 25 S. Ct. 84, 49 L. Ed. 269. It might afford a basis for negotiation between shipper and consignee on basis of C. I. F. sale, as to which no opinion is intended. The unsold lumber necessarily required storage; in this situation the agreement was made, without evil intent, but inspired by overruling "economic forces" which changed the "economic level." Atchison, etc., R. Co. v. United States, 284 U. S. 248, 254, 52 S. Ct. 146, 76 L. Ed. 273. No discrimination was made by the common carrier for the special return cargoes on imposed terms and conditions, in view of available cargo, which was unfair or unjustly discriminatory, and it is not apparent how or in what manner it created "an undue preference," since the shipper furnished the full cargo and hazarded a greater expense for storage for unsold cargo to furnish emergency cargo for carrier, and gave it no undue advantage over competitors. It is readily conceivable that the expense of storage of cargo might create a greater liability to the shipper than the difference between the $8 rate and the $10 rate, and be not a beneficial condition, and lifted the arrangement above any undue or unreasonable preference, placing it on a more equal economic basis by reason of economic conditions which neither could control; and likewise distinguishes it from any unjust, unfair, or unduly discriminatory relation, and certainly comes within the standard of "due regard being had for the proper loading of the vessels and available tonnage."

Prince Line v. American Paper Exports (D. C.) 45 F.(2d) 242, affirmed (C. C. A.) 55 F.(2d) 1053, is distinguished, in that the arrangement was an unjust device to secure an unjust rate and was a continuous general practice and foreign to available tonnage, and obviously was undue preference. In the instant case, there is no relation of unjust or unfair device to secure a less rate than the "regular rates then established and in force" applicable to any of the ships. In any event, the shipments are out of the limit of the time of the herein carriers' tariff agreement.

Decree in accordance with the stipulation as to the amount due.