PARISH & CO. *v.* YAZOO & MISSISSIPPI VALLEY RAILROAD CO.

[60 South. 322.]

1. EVIDENCE. *Market value. Carriers. Delay of freight. Measure of damages. Statute of fraud. Failure to furnish cars. Excuse.*
   The "market value" of a commodity, in its last analysis means the price which it will bring in cash from the buyer who is willing to pay its value, and the fact that staple cotton is not quoted upon cotton exchanges does not prevent it from having a market value, which can be shown in an action for damages.

2. CARRIERS. *Delay of shipment. Measure of damages.*
   Where a carrier by negligently delaying the shipment of cotton caused the loss of the sale of the cotton, the actual loss to the consignor is the measure of damages in a suit by him against the carrier.

3. SAME.
   In such case the fact that there was no written contract between the seller and the buyer of the cotton, cannot be availed of by the

carrier to avoid liability for its negligence as the pleading of the statute of frauds was a privilege personal to the purchaser.

4. Carriers. *Failure to furnish cars.   Delay.   Excuse.*

A delay of six days by a carrier to furnish cars for the shipment of goods is not excused by the fact that the city had dug a ditch three or four feet wide and six to eight feet deep under its spur track, it not being shown that the railroad could not have easily braced its tracks.

Appeal from the circuit court of Tallahatchie county. Hon. N. A. Taylor, Judge.

Suit by S. B. F. Parish under name of Parish Company against the Yazoo & Mississippi Valley Railroad Company. From a judgment for nominal damages for plaintiff, he appeals.

The facts are fully stated in the opinion of the court.

*Harris & Cannon,* for appellant.

Under the facts of this case, appellant was entitled to recover the loss of the profits caused by the breach of his contract of sale.

A common carrier is bound to provide sufficient facilities for the reasonably prompt transportation of goods tendered for carriage, and is liable for a failure to transport promptly, whether the failure is due to a want of facilities or to a captious refusal to carry. *Y. & M. V. R. R. Co.* v. *Blum Co.,* 88 Miss. 180, 40 So. 748; 89 Miss. 242, 42 So. 282.

The damages for which a carrier is liable for refusal to receive property for transportation includes reasonable profits that could have been earned in the shipper's business, of which he has been deprived by inability to secure transportation; also loss of the benefits of a contract which the shipper was undertaking to perform by shipment of the goods in question.   6 Cyc. 375.

The damages for failure to furnish cars to ship property in fulfillment of a contract are the profits which the shipper would have made on the contract if the cars had been furnished; and a carrier's knowledge of the shipper's

103 Miss. 19

contract is not necessary in order to make it liable for failure to furnish cars when demanded in order to make shipments to fill the contract. "Insofar as there is no difference in respect to damages between cases of contract and tort, the measure for a breach of a contract is the more restricted," quoting 43 L R. A. 232, from the opinion of the court. *Railway Co.* v. *Campbell,* 91 Tex. 551, 43 L. R. A. 225.

We think the proof shows that this cotton is what is known as "staple cotton"—cotton of a quality that has no definite market value, and therefore the measure of appellant's damages would not be governed by the ordinary rule as to the differences between market values. We believe that under the facts as shown by the record in this case, appellant was entitled to recover not on the difference between the price paid by him for the cotton and the price he would have realized under his contract of sale had the contract not failed, but also the difference between the price he paid for the cotton and the price at which he was forced to sell after the failure of his said contract.

We submit that the record shows that appellee was guilty of willful and gross negligence in permitting its tracks to be rendered impassable and useless, and to remain so from the 3rd day until the 10th day of January, a week, during all of which time appellant was importuning its duly authorized agents to have the breach in the track closed and the cars which had been promised appellant by the appellee's agent, Smith, on January 3rd furnished for the transportation of this cotton; on the faith of which promise, appellant purchased the cotton, expecting to resell it at a profit. We think appellee's conduct shows a willful, wanton and reckless disregard of not only appellant's rights, but of the rights of the general public engaged in the shipping of cotton from the town of Charleston. We believe it to be a fair deduction from the testimony in this case that appellee, by the exercise of ordinary care and effort, could, even after the ditch

had been dug under the right of way, have made its track safe for the passage of cars and for the transportation of all freight that might have been tendered it for carriage at the farmers warehouse. *Res ipsa loquitur.* If this ditch had been dug under appellee's right of way at any point on its main line between Clarksdale and Jackson, how long would its track have been permitted to remain in such condition as to obstruct the passage of trains? May a railroad company, a common carrier, sit quiescent and impassive and see its track undermined, its approach to a public warehouse, where it holds itself out for the receipt of freight, cut off, and for a week, over the urgent protest of a shipper entitled to the service of its road, cars and trains, do nothing to restore the several lines of commerce? May it thus act, and hope to be acquitted of the charge of willful and gross negligence and recklessness? The declaration in this case expressly charges willful and gross negligence and recklessness, and we think the charge is amply sustained by the evidence.

Where a common carrier wantonly and in gross neglect of its duties as a common carrier, and in reckless disregard of a shipper's rights, willfully refuses to accept and transport freight tendered it for carriage, it is liable not only for compensatory, but for exemplary damages; and in such case, a plaintiff may recover for actual, though remote, losses sustained. *Silver* v. *Kent*, 60 Miss. 124.

We submit that under the facts as disclosed by the evidence in this case, appellant, plaintiff in the court below, was entitled to have his case submitted to the jury under proper instructions; and that in cutting off such right by giving the defendant an instruction directing the jury that they could find no damages for plaintiff except nominal damages, and in refusing plaintiff's motion for a new trial, the learned judge committed reversible error.

*Mayes & Mayes*, for appellee.

Counsel for appellant cite the case of *Y. & M. V. R. R. Co.* v. *Blum,* 88 Miss. 180 and 89 Miss. 224, as supporting

their contention, but we utterly fail to see the application, of these authorities. The above cases simply announce universal law controlling railroads, and hold that railroad companies are liable for the failure to provide ordinary equipment for transportation under normal conditions. No question involved in this case is akin to the question involved in the above cases.

Counsel for appellant again cite 6 Cyc. 375 to the effect that when a carrier refuses to receive property for transportation, the shipper may recover as damages reasonable profits. And the loss of the benefits of the contract which a shipper was undertaking to carry out.

This statement of Cyc. in the text seems to be unsupported by any authority, except one Kentucky case; but let us concede, for the sake of argument, that the text of Cyc. is correct, then what have we? There was no refusal on the part of appellee to receive for transportation the cotton in question. The city had made it impossible to use the switch leading to the warehouse, where the cotton was stored, for shipment. But let us go further. It is not shown that there would have been any profits in this transaction. This is left entirely to speculation. If the cotton had reached Charleston and Ellio had delivered it to the proposed buyer, and if this proposed buyer had stuck to his proposition, there might have been profits of a small nature; but all this is a matter of the purest speculation, and on such basis, no law allows a right to damages to be built up. There was no contract in this case that could be breached and no suit to be maintained on that account. The only possible predicate of this suit lay in the fact that it could be claimed that appellee did not perform its duty as a common carrier. If this be conceded, and we deny that it is so, there was no willfulness attached to the failure, and, therefore, no element of punitive damages. Mr. Parish knew when he demanded the placing of the cars at the warehouse that it could not be done; he knew that the condition of the track would prevent its being done; and he knew that it made no difference how often, or how vio-

lently he made the demand, the railroad company could not comply. This condition appertained before he thought of buying and selling any cotton, and he knew it, or he would not have been so active as he was. The railroad was constructed for that kind of business, and would have complied, if it could. The profits which he claims he could have made were not predicated of any legal rights he had, but were based on his faith in the promise of the party to take the cotton at Greenwood. We all know how often human promises fail us.

We are confident that this court will find that it will have to affirm the judgment of the court below.

Cook., J., delivered the opinion of the court.

Under the firm name of Parish & Co., Mr. S. B. F. Parish was engaged in the business of buying and selling cotton at Charleston, in January, 1910. On the 3d day of January, having an opportunity to buy forty bales of staple cotton, he called up his factor at Greenwood, described the cotton to him, and made a contract with the factor to sell the cotton at a stipulated price, should the same reach Greenwood within the week. The 3d of January fell upon Monday. After making arrangements to sell the cotton upon the terms above stated, Mr. Parish called up the station agent of appellee and secured from him a promise to place cars upon the sidetrack of the Farmers' Warehouse, the place where the cotton was stored, that afternoon, to be loaded the next morning, whereupon Parish purchased the cotton to be delivered on the contract. The next morning, the 4th, Mr. Parish secured laborers to load the cotton; but when he reached the warehouse the cars had not been placed according to agreement, and he then called the railroad agent over the telephone and inquired why the cars had not been placed. Then it was that the agent informed appellant that on the morning before the town authorities had excavated a trench under and across the right of way of the company, which had so weakened the track as to render it unsafe to haul the cars over the sidetrack. Parish then advised the agent of the contract, its time limit, and

the importance of his having the cotton in Greenwood in time, and insisted that something be done. The section foreman was also advised of the situation, but he said it was not his business to fix the track so that the cars might be placed. The upshot of the whole matter was that appellee was not furnished cars until the 10th of January. In the meantime, the cotton market had weakened, the sale of the cotton was impossible at the stipulated price, and appellee lost a tidy sum of money on account of his failure to deliver the cotton within the prescribed time. With these facts before the jury, the trial court instructed the jury to return a verdict for plaintiff for nominal damages only, which was accordingly done; wherefore, this appeal.

Unaided by counsel it is possible that we would be unable to apprehend upon what theory this instruction was given by the learned trial judge.

In the first place, counsel insist that, staple cotton having no fixed market value, it is impossible to liquidate the damages suffered by appellant. The evidence discloses the damages suffered by appellant. The evidence discloses that staple cotton is not quoted upon exchanges, which we understand to mean that cotton quotations refer to upland, or short staple cotton alone, and from this starting point it is argued that staple cotton has no market value. We cannot accede to this proposition, for the "market value" of a commodity, in its last analysis, means the price which it will bring in cash from a buyer who is willing to pay its value. It would, no doubt, be a shock to the producers of long staple cotton should this court announce as a matter of law the value of their product cannot be proven in the courts, because it is not embraced in the daily market quotations.

Aside from this, the damages of appellant were satisfactorily and clearly established by showing the price at which the cotton was sold and the price received after the expiration of the time limit, and by proving that the slump in prices was occasioned by appellant's failure to ship the cotton within the prescribed time, and that his default

was caused by the carrier's negligence. The evidence shows that the sale of the cotton was made through a cotton broker, at a stipulated price; that the broker actually sold the cotton at the proven figures, if delivered within the week. But it is contended that no written memorandum of the contract was made between the broker and appellant, or between the broker and the purchaser, and for this reason no recovery could have been had under the contract. As between the seller and the purchaser, this is true; but it does not follow that the statute of frauds can be used by the carrier to excuse itself from its negligence—this privilege was personal to the purchaser. Besides, the evidence of the broker demonstrates that, had the party to whom he had sold the cotton breached his contract, he considered it his duty and he would have protected Mr. Parish.

Counsel on opposite sides of this controversy find no common ground upon which to stand—they are as far a part asthe poles. It seems to us that there is but one question involved, and that is, was the carrier prevented by a superior force from performing its plain duty to furnish means of transportation within a reasonable time; it appearing that there was such failure on its part. It appears, not very clearly, that the town authorities had, in the process of digging a public sewer, excavated under the track serving the warehouse, and that this excavation so weakened the track that it would have been hazardous to run trains over it. There is no excuse given by the carrier—no witness was introduced in its behalf—but certain scraps of evidence crop out in the testimony of plaintiff's witnesses, which are relied on as a defense. The plaintiff said that the station agent told him that the town had excavated the ditch under the track. Mr. Barnes, another witness for the plaintiff, said he understood that the work was done by the town. This and other like statements form the only basis for the contention of appellee.

Conceding, for argument's sake, that there is sufficient evidence in the record to warrant a finding that the ob-

struction of transportation was caused by the town, by
what and upon whose authority the public work was be-
ing done does not appear.   The track was put out of
commission Monday morning.   A ditch three or four
feet wide and six to eight feet in depth was run diagonally
under the track, two or three crossties were removed,
and only the rails spanned the ditch.   This was the sum
total of the obstruction, and why it was not a simple mat-
ter, requiring but little skill and labor, the expenditure
of a small amount of money, and the consumption of only
a few hours, to restore traffic over this spur, is beyond
our power to comprehend.   The public service corporation
owes a duty to its customers, and some valid reason must
be given why it failed to perform this duty, and mere con-
jecture or argumentation from fragmentary facts will
not suffice.   Here was an unusual, and to us inexplicable,
delay, when we recall the many stupendous tasks per-
formed in a marvelously short time by the well-organized
forces of great railway sustems like the one in the present
case.   The bridging of this small ditch was mere child's
play compared to others accomplished within a few hours,
according to our views and observations, and the loss
to an enforced customer of the amount lost in the present
instance is no mere trifling matter, and he should not be
denied a trial of his case, unless it appears as a matter of
fact that a superior force prevented the carrier from doing
its plain duty.   There may be good reasons for the de-
lay, but from the record we find no semblance of excuse
after giving to the proven facts a much broader signific-
ance than they deserve.   It may be that it was impos-
sible to repair the track, but this must appear as an un-
controverted fact before the court will be authorized to
take the decision of the case from the jury.   The ques-
tion is: Does the record show that the delay was un-
avoidable under the circumstances?   And the answer is
in the negative.

*Reversed and remanded.*

SMITH, C. J., took no part in the decision of this case.