### EDWARDS MFG. CO. v. BRADFORD CO.

(Circuit Court of Appeals, Second Circuit. November 19, 1923.)

No. 30.

1. Appeal and error ⬥213—Party should request certain issues be sent to jury.
   Where court denied defendant's motion to dismiss the complaint, and did not fully grant plaintiff's motion to direct a verdict, but sent certain issues to the jury, defendant cannot complaint that other issues were not sent to the jury, in the absence of a request therefor.

2. Principal and agent ⬥174—Ratification as question of fact or law.
   Whether or not a contract has been ratified is sometimes a question of fact and sometimes one of law.

**3. Principal and agent ⬅170(3)—Sale ratified, in absence of notice of limit of authority.**

If an agent receiving order for goods, exceeded his authority, it was the seller's duty within a reasonable time to notify the purchaser, and to return a letter of credit given, and a silence of 15 days, when subcontract period was soon to expire, constituted ratification as a matter of law.

**4. Principal and agent ⬅137(1)—Lack of agent's authority as ground for rejection of contract must be specified if relied on.**

Where order for goods was not rejected on ground of agent's lack of authority, seller could not subsequently rely on lack of authority as a defense in an action for damages for failure to deliver.

**5. Frauds, statute of ⬅143(1)—Defense personal to contracting parties.**

In an action for damages for failure to deliver goods, plaintiff claiming damages by reason of loss of profits on a contract with a third party, defendant cannot set up defense that the contract with the third party was not enforceable because within the statute of frauds of New York (Personal Property Law, § 85); such defense being personal to the contracting parties.

**6. Frauds, statute of ⬅120—Law of state where contracts executed controls.**

The law of the state where a sales contract is executed must govern as respects defense of statute.

**7. Sales ⬅418(12)—Purchaser not limited to reasonable profit.**

A purchaser entitled to recover profits lost by reason of its inability to fill its resale or subcontract is not limited to a reasonable profit, such as was customarily obtained at the time by persons dealing in the same goods, where the goods were not easily obtained, and there was no market value, and the profits were not extravagant or exceptional, and it is not necessary for the purchaser to communicate to the seller the price of its subcontract.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Bradford Company against the Edwards Manufacturing Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Writ of error to a judgment for $31,200 in favor of defendant in error, which was plaintiff below.

The parties will be referred to as aligned below.

The facts will be stated only so far as necessary to present the questions of law here reviewable.

On September 6, 1917, plaintiff made a contract in writing with the Japanese firm of Suzuki & Co. to sell 300 tons of sheet steel, 30 gauge, at 10 cents per pound; shipment to be completed by the end of December, 1917.

Pursuant to the terms of this contract, Suzuki & Co., on September 24, 1917, delivered to plaintiff a letter of credit for $70,000.

Daycock was the New York agent of defendant, an Ohio Corporation. Having learned that Aaron Hecht was in the market for export steel, defendant, in a letter from its office in Cincinnati, dated November 16, 1917, suggested to Daycock "to get in touch" with Hecht, who was majority stockholder of plaintiff and a member of its executive committee. Daycock called on Hecht prior to November 22, 1917, and proposed to sell 28 gauge steel, and Hecht told him that plaintiff had an order for export to Japan of 30 gauge steel. After this conversation, Hecht telephoned to Mr. Kitahama of Suzuki & Co., who stated that it would be satisfactory if plaintiff shipped 29 gauge steel instead of 30 gauge.

After this and on or about November 22d Hecht informed Daycock that "our customer, whom we had taken the order from for the Far East, was willing to accept twenty-nine gauge on his order of thirty gauge."

Under date of November 22, 1917, plaintiff received a letter (plaintiff's Exhibit 2) addressed to it and signed "The Edwards Manufacturing Co., per W. H. Daycock, Jr., Manager New York Office," which read in part, "This will confirm our having entered your order for" 350 net tons of 29 gauge steel at 6 cents per pound. "As explained to your Mr. Hecht, it is our intention to complete the order on or before December 31, 1917, and we will do everything in our power to accomplish that end. It is understood that you will furnish us at once with a banker's letter of credit covering the amount involved in the above order."

On November 22d, plaintiff acknowledged (plaintiff's Exhibit 3) receipt of "your acceptance of our order," stated that it would immediately open a credit for the full amount, approximately $42,000, and referred to the point that the terms were cash less 2 per cent.

On November 22d, defendant, per Daycock, wrote plaintiff (plaintiff's Exhibit 4), accepting the terms of cash less 2 per cent.

On November 22d, Daycock telegraphed defendant, "Have closed with Hecht" 350 tons 29 gauge "November and December shipment" 6 cents per pound, "have mailed order letter credit follows tomorrow." The same day Daycock confirmed this telegram to defendant by written memorandum of the order described in the telegram.

On November 23d, plaintiff delivered to Daycock a letter of credit of Guaranty Trust Company of New York for about $42,000, and Daycock at once sent on the letter of credit to plaintiff at its main office in Cincinnati.

On November 24th, plaintiff wrote defendant, giving instructions to ship the steel for export to Seattle for export to Japan, and this letter was immediately forwarded to plaintiff at Cincinnati.

At one of the conferences between Daycock and Hecht, either on November 21st or 22d, Edward W. Edwards, president of plaintiff, was called on the long distance telephone, and he talked with Daycock and Hecht. There is a conflict between the testimony of Hecht, on the one hand, and Edward W. Edwards and H. W. Edwards, treasurer of plaintiff, on the other. The main point of difference related to time of delivery. Other details need not be recited. Both E. W. and H. W. Edwards tried to fill the contract, but found they could not do so.

On December 10th, defendant, per E. W. Edwards, wrote to plaintiff as follows:

"Our Mr. Daycock has explained to us the result of his visit to your office on Friday last and so that you may know our position in the matter, will say that when Mr. Daycock called us up from your office, he asked us if we could take an order for this material at $6.25 per 100# f. o. b. mill. We stated we could but could not finish it in December. This same information was given by the writer to Mr. Hecht, when Mr. Daycock handed the receiver to him.

"When the writer was through with the conversation and hung up the receiver here, he understood that we were to get an order for 350 tons No. 29 gauge at $6.25 per 100# f. o. b. mill, part delivery December and January. The order came in at $6.00 per 100#, December shipment complete, and as our mill was entirely unable to make December shipment, we endeavored to see if it could be secured in the market, but found it could not. We thereupon told our representative we could not enter the order because it was a physical impossibility to comply with the terms.

"If you wish us to enter this business for reasonable shipment and at the price which the writer understood over the telephone would get the business, we will enter the business. We are explaining our position clearly so that there will be no misunderstanding, and only regret the circumstances were such that we could not enter the business as per your wishes.

"We are asking our Mr. Daycock to see you in person so that he may get your decision."

On the same date, E. W. Edwards wrote to Daycock:

"Inclosed find copy of letter to the Bradford Company. * * *

"Would suggest that you see them and tell them we are very anxious to do business with them, but we cannot agree to do impossibilities. I think it essential that you follow our letter up with a personal visit, and *it might*

*be well for you to tell them, before the visit is over, that your instructions from us are to the effect that no contract is binding until acknowledged by our main office.* I think it has been decided legally many times than an agent cannot bind a principle unless the agent has legal authority to do so." (Italics ours.)

December 17th, Daycock wrote plaintiff returning the letter of credit. This letter of credit had been in defendant's possession since November 23d, and on that day had been sent on to the main office in Cincinnati.

Defendant neither delivered nor tendered any of the steel. As the result of the failure to deliver, plaintiff brought this action to recover the difference between the contract price with defendant of 6 cents per pound and the resale contract price with Suzuki & Co. of 10 cents per pound.

Zabriskie, Sage, Kerr & Gray, of New York City (William E. Sims, of New York City, of counsel), for plaintiff in error.

Engelhard, Pollak, Pitcher & Stern, of New York City (Walter H. Pollak and Carrol S. Loeb, both of New York City, of counsel), for defendant in error.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). The trial court submitted three questions of fact to the jury (1) whether the contract with Suzuki & Co. was modified, (2) whether defendant had notice at the time of contracting with plaintiff that plaintiff had a then existing contract of sale to a Japanese customer, and (3) whether damages should be computed by taking the Suzuki contract on a long ton or a short ton basis.

Daycock had died before the trial, and, although Hecht's testimony in respect of questions (1) and (2) was uncontradicted, he was an interested witness, and, for that reason, the court submitted these questions to the jury.

As the jury decided question (3) in favor of defendant, i. e., computed on the short ton basis, that feature has disappeared from the case.

1. It is first contended that the court should have sent to the jury the question as to whether Daycock had authority to make the contract evidenced by plaintiff's Exhibits 2, 3, and 4.

We have examined, not only the printed record, but as well the typewritten transcript (submitted by consent) of additional colloquy between court and counsel.

Nowhere did counsel for defendant ask to go to the jury on this question, nor on the question as to whether, even if Daycock had not authority to bind defendant by the particular contract in question, nevertheless defendant's conduct amounted to a ratification of the contract. At the end of all the discussion, the court concluded that the question of ratification was one of law, to be decided by the court and not by the jury, and that, as he decided the question of ratification in favor of plaintiff, the question as to Daycock's authority did not require decision.

It is sometimes said by those who, perhaps, have not given the subject careful thought that questions as to the effect of motions to dismiss or direct or of failure to ask to go to the jury are technicalities in the invidious sense. They are not such, but, on the contrary are the technique of law or practice made necessary in order to prevent, if possible,

repeated trials, and to make clear in jury cases what counsel contend are questions of law or of fact.

In the interest of just disposition, the court and counsel are entitled to know by definite request whether or not counsel desires, questions to be submitted to the jury.

We need not set forth in detail the various motions made here by each party at the end of the case. It is enough to state that, at the close. of the whole case, plaintiff moved that the court direct a verdict in its favor, and that it leave with the jury no issues except the issue of the amount of damages dependent upon whether the contract with Suzuki & Co. called for long or short tons.

The court denied defendant's motion to dismiss the complaint. but did not fully grant plaintiff's motion to direct a verdict as made; but, on the contrary, sent to the jury the three questions referred to supra, and itself decided the other questions. Defendant did not ask to. go to the jury on the question of authority of Daycock or on the question of ratification.

[1] If defendant had desired the court to submit to the jury any questions other than those which he did submit, it was the duty of the defendant either to ask the court to go to the jury upon all the issues of fact, or to request that certain specified issues be sent to the jury. Williams v. Vreeland, 250 U. S. 295, 298, 39 Sup. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038; Fire Association of Philadelphia v. Mechlowitz (C. C. A.) 266 Fed. 322; Columbia Aid Association v. Sprague, 271 Fed. 381, 50 App. D. C. 307; Dounce v. Dow, 64 N. Y. 411; Brown Paint Co. v. Reinhardt, 210 N. Y. 162, 104 N. E. 124.

[2] 2. But the case need not go off on a question of practice. Whether or not a contract has been ratified is sometimes a question of fact and sometimes one of law.

The telegram from Daycock to defendant that Daycock had closed with Hecht was dated November 22d. On the same day, Daycock's letter and order memorandum went forward as did the letter of credit on November 23d. As a Sunday intervened, E. W. Edwards testified that he received these on November 27th.

[3] If Daycock had exceeded his authority, it was defendant's duty within a reasonable time (which in this case meant promptly) to notify plaintiff and return the letter of credit. Instead of this, all that Edwards did was to telegraph Daycock on November 27th, "Impossible to have rolled Hecht's order without priority order. Government's requirements won't permit it," and Daycock's son testified that he read the substance of this telegram to Hecht.

On November 27th, Daycock telegraphed plaintiff that Hecht did not understand the meaning of "priority order," and E. W. Edwards testified that after receiving this telegram he inquired of several mills, and they would not take an order at that time, and H. W. Edwards testified substantially to the same effect. Thus, on or about November 27th, defendant understood perfectly that it could not or would not carry out its contract, whether for one reason or another.

If Daycock had not authority, and if the telephone conversation supra between Hecht and Edwards was as testified by Edwards, then all the more necessary on the facts in this case to notify plaintiff prompt-

ly that Daycock had no authority to make the contract. Silence, in the circumstances here disclosed, between November 27th and December 12th (15 days) when the contract period was soon to expire, constitutes ratification as matter of law. Johnson v. Jones, 4 Barb. 369; Foster v. Rockwell, 104 Mass. 167; Halloway v. Arkansas City Milling Co., 77 Kan. 76, 93 Pac. 577; 2 C. J. 505, 509; 31 Cyc. 1275.

[4] But, in addition to the foregoing, another settled and salutary principle is applicable. The letter of December 10th did not place rejection on the ground of Daycock's lack of authority. Indeed, the letter of the same date from plaintiff, per Edwards, to Daycock showed that the point of Daycock's lack of authority was an anchor to windward, whose existence was not to be made known to plaintiff until sometime before the "visit is over." But afterthoughts in litigations do not permit a party "to mend his hold," as was quaintly but effectively said in Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. See, also, Littlejohn v. Shaw, 159 N. Y. 188, 53 N. E. 810; Schuyler County v. Missouri Bridge Co., 256 Ill. 348, 100 N. E. 239.

[5, 6] It is contended that the oral modification of the contract between plaintiff and Suzuki & Co. was void under the statute of frauds, and that plaintiff could not have recovered against Suzuki & Co. Therefore, it is argued that, as the basis of plaintiff's recovery is that there was a binding resale contract, that basis is destroyed when it appears that plaintiff's so-called modified contract was not enforceable; for it is urged that in such case the damages at once become uncertain and speculative, depending entirely on the caprice of the purchaser and other "unpredictable elements."

We need not determine what would have been the rights of Suzuki & Co. as against plaintiff, had these two engaged in controversy in respect of the legal effect of the oral modification. The reason is that the defense of the statute of frauds is personal to the contracting parties—here plaintiff and Suzuki & Co.

As the contract in the case at bar is a New York contract, we look to the New York statute, which no longer uses the word "void" (although, when the word "void" was used, see Crane v. Powell, 139 N. Y. 379, 384, 34 N. E. 91), but reads:

"A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action. * * *" Uniform Sales Act (N. Y. Personal Property Law [Consol. Laws, c. 41] § 85).

The principle here concerned is well stated by Judge Speer in Purdom Naval Stores v. Western Union Telegraph Co. (C. C.) 153 Fed. 327, 330:

"The statute merely states that 'no action shall be brought.' Failure to comply with its terms does not * * * render the contract void, but unenforceable. * * * It is besides true that the benefit of the statute of frauds as a defense is entirely personal, and cannot be set up by third parties. * * * It follows that whether or not the statute was complied with by the parties to the proposed sale, that question cannot now be raised by the defendant company, which was no party to the transaction."

It is said by defendant that this is dictum, but, in any event, it states the principle applied to various states of facts in many cases.

Perhaps the most striking case is Cahill v. Bigelow, 35 Mass. (18 Pick.) 369, in which the opinion was written by Chief Justice Shaw. In that case, the question was whether a trustee was obliged to set up the statute of frauds, and the court, after stating that "the effect of the statute is that the promisor, who would otherwise be liable to such an action, may avoid it," concluded:

"The trustee in effect declares his election, not to avail himself of the statute of frauds to avoid his parole undertaking to pay these debts, but to pay them according to the original understanding between him and the other parties. * * * *"

See Moore v. Crawford, 130 U. S. 122, 129, 9 Sup. Ct. 447, 32 L. Ed. 878; Kemp v. National Bank of the Republic, 109 Fed. 48, 54, 48 C. C. A. 213; Rice v. Manley, 66 N. Y. 82; Cahill v. Bigelow, 35 Mass. (18 Pick.) 369; Hoffman v. Bank, 231 Mass. 324, 121 N. E. 15; Parish v. Railroad Co., 103 Miss. 288, 60 South. 322; Schulze v. Buckeye Lumber Co., 94 Wash. 520, 162 Pac. 588; 17 C. J. 794.

In view of the foregoing, there is no merit in the argument that plaintiff was required to prove, in effect, that Suzuki & Co. would not interpose the defense that the oral modification of the contract avoided it; because the reasoning of these cases is that the contract is valid or at least not void and merely unenforceable at the option of the person against whom it is sought to be enforced.

[7] 3. At the conclusion of the case, the court was asked to "leave to the jury the question of whether or not the profits on the subcontract with Suzuki & Co. were reasonable profits under all the circumstances." This request was denied and exception duly taken.

Thus, there is presented the contention of defendant that, even though plaintiff be entitled to recover profits lost by reason of its inability to fill its resale or subcontract with Suzuki & Co., its recovery in this respect must be limited to a reasonable profit, such as was customarily obtained at the time by persons dealing in steel sheets for export.

In support of this proposition, defendant has cited, among others, the cases of Horn v. Midland Railway Co., 8 L. R. C. P. 131, and Guetzkow v. Andrews, 92 Wis. 214, 66 N. W. 119, 52 L. R. A. 209, 53 Am. St. Rep. 909, but before discussing these cases the facts in the case at bar should be briefly recapitulated.

The verdict of the jury established that Hecht made fully known to Daycock (1) prior to November 22, 1917, i. e., prior to the contract, that plaintiff had an order for export of 30-gauge steel to Japan and (2) later, on November 21st or 22d that the customer from whom the order for the Far East had been taken by plaintiff was willing to accept 29 gauge.

As evidenced by its letter to Daycock, dated November 16, 1917, defendant knew at a time prior to the date of its contract with plaintiff that steel 36″ wide was "very difficult to obtain," and it also understood that Hecht would "pay a premium to get a quantity of 36x28x 72," and it instructed Daycock "to try him out at about 6½ cents per pound."

The Horn Case was decided by a divided court. In that case, plaintiffs, in the beginning of the year 1871 contracted to supply at 4s. a pair a large quantity of shoes to Hickson & Co., who required them to fulfill a contract for the supply of the French army during the Franco-Prussian war. The last day of delivery by plaintiffs was February 3, 1872, and all shoes not so delivered would be thrown back on plaintiffs' hands. Plaintiffs delivered a certain quantity of shoes to the railway company consigned to Hickson & Co. in London in time to be delivered on February 3, 1872. Notice was given to the station master that plaintiffs were under contract to deliver on that date, and, if not so delivered, the shoes would be thrown on plaintiffs' hands; but no further information was given to defendant. The shoes were not delivered in time and were rejected. Plaintiffs could only sell the rejected shoes at 2s. 9d. a pair, and in consequence of the cessation of the war the consignees for their French contract could not have sold them at a higher price even if duly delivered. Defendants paid into court an amount which was sufficient to cover the ordinary damages to which plaintiffs would be entitled; but plaintiffs claimed to be entitled to recover the difference between 4s. and 2s. 9d. a pair. There was some discussion as to the distinction between the damage liability of a common carrier compelled to accept the transportation of goods and that of one voluntarily making a contract, but we think it unnecessary to consider that question. The marked difference between the Horn Case and that at bar is that, in the Horn Case, the information conveyed to the carrier did not indicate any special circumstances, except the time of delivery, and did not make known that there was a contract for sale in France which necessitated transshipment to that destination; while, in the case at bar, it was made entirely clear that the steel was for export in war time to a Japanese customer.

In Booth v. Spuyten Duyvil Rolling Mill Co., 60 N. Y. 487, the court, per Church, Ch. J., said, at page 494:

"But the mere circumstance that the vendor does not know the precise price specified in the contract will not exonerate him entirely. He cannot, in any case, know the precise market price at the time for performance. Knowledge of the amount of damages is impracticable, and is not requisite. It is only requisite that the parties should have such a knowledge of special circumstances, affecting the question of damages, as that it may be fairly inferred that they contemplated a particular rule or standard for estimating them, and entered into the contract upon that basis."

As early as November 16, 1917, defendant knew that plaintiff was in the market for this kind of merchandise. It also knew that steel of this character was difficult to obtain and, as disclosed by the record, it must have known that the price of such a commodity, in war time, had been and likely would be subject to variations. The government of the United States did not fix prices until November 5, 1917, and on September 6th, the day that plaintiff entered into its contract with Suzuki & Co., the market price for 28 gauge steel was 8 to 9 cents, as shown by "The American Metal Market and Daily Iron and Steel Report." The uncontradicted evidence shows that with certain premiums the 30 gauge steel originally contracted for by plaintiff with Suzuki & Co. had a market value of about 9 cents.

Where there is a subcontract, it may be, in some circumstances, that a defaulting party should not be held for extravagant or exceptional damages. The question is not whether the difference between the Suzuki & Co. contract with plaintiff for 10 cents and the contract between plaintiff and defendant for 6 cents represented a reasonable profit, where special circumstances are made known. At most, it is whether the price fixed by the subcontract is such that it can be characterized as extravagant or exceptional.

Whether other persons then trading in the market made more or less profit is not to the point. A profit of 1 cent on 9 cents, which is less than 12 per cent., cannot, in the circumstances shown in this record, be held to be an unreasonable profit; and what is reasonable is, in this case, as in most cases, a question of law. Earnshaw v. United States, 146 U. S. 60, 67, 13 Sup. Ct. 14, 36 L. Ed. 887; In re B. & R. Glove Corp. (C. C. A.) 279 Fed. 372, and Agnello v. United States (C. C. A.) 290 Fed. 671.

When plaintiff made its contract with Suzuki & Co., it ran all the risk of the market. If the price of steel had gone up, it would have lost money and, of course, as the price of steel went down, largely due to fixation of price by the government, it was in a position to make a profit. In addition to the foregoing it appeared from the testimony of Gausden, an expert witness for defendant, that the last sale of steel of this kind made by him was in August, 1917, and that he did not know of any person who in December, 1917, had on hand the necessary steel of this description. Alexander, another expert witness for defendant, knew of no one who on December 10th had or could have obtained the necessary steel for delivery by December 31st, and, indeed, the evidence is uncontradicted that there was no market value for this steel from on or about December 10th for delivery on December 31st, for the very good reason that such steel was not obtainable. Further there was no evidence that such steel was obtainable on or after November 22d, although there were some general statements by Alexander, but no specific instances which he could point out, where such steel could be procured for delivery by December 31st; and the evidence above referred to of the two Messrs. Edwards shows that they were unable, after all their efforts, to procure this steel for delivery at the agreed date.

Thus, in addition to the information given by Hecht to defendant, it was well known to defendant that the steel was not readily obtainable in the market, and the defendant knew, as alleged in its answer, that "said goods, because of the unusual width of the sheets, had to be specially manufactured by defendant, and were not standard, and were not readily obtainable in the market, * * *" and defendant cannot now avoid the consequences of its answer, even though it offered no proof in support of its allegations. Paige v. Willet, 38 N. Y. 28, 31.

The result is that the case is one of special circumstances, which brings it within Booth v. Spuyten Duyvil Rolling Mill Co., supra, and the Northern Pacific Railway Co. v. American Trading Co., 195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269. While both sides find comfort in the Booth Case, it is plain that the views there expressed lean, on

these facts, to the conclusion here stated. While the question here involved seems not to have been discussed in the Northern Pacific Railway Co. Case, supra, the result there was the same as that attained by plaintiff in the case at bar in the verdict below.

In Guetzkow v. Andrews, 92 Wis. 214, 66 N. W. 119, 52 L. R. A. 209, 53 Am. St. Rep. 909, the case involved no question of the failure ·of vendor to deliver goods which he had promised, and of the resultant inability of vendee to deliver on his own subcontract. Defendant in that case claimed that, by reason of certain defects, it lost profits amounting to from 100 to 150 per cent. on the value of the amount which otherwise it would have gained by selling them to exhibitors at the World's Fair. The claim, therefore, was not for damages for breach of an executory contract of sale, but for breach of warranty in connection with an executed sale. The court confined its conclusion to the "precise question here presented," and, in so far as the court discussed the rule applicable to executory contracts, its views were the same as those which plaintiff here advances.

We have not overlooked our own case of Mitsubishi Shoji Kaisha v. Davis (C. C. A.) 291 Fed. 57, certiorari denied ——, U. S. ——, 44 Sup. Ct. 34, 68 L. Ed. ——. In that case we held that the notice to the carrier was wholly insufficient to charge it with knowledge of special damages plaintiff might sustain by delay or loss in transit.

But, in the case at bar, we are of opinion that the record shows without dispute that the special circumstances of the contract between plaintiff and Suzuki & Co. were made known to defendant, and, as we have stated supra, and as is fully discussed in the Booth Case, it was not necessary for plaintiff to communicate to defendant the price of its subcontract. The result is that the court below did not err.

We have considered the other questions referred to in the able briefs of counsel, but they were rightly decided below, and do not call for discussion.

Judgment affirmed.

---

⊙⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes