## SOUTHERN RAILWAY COMPANY *v.* BAKER.

On its facts this case is controlled by the principles ruled in the case of Atlantic Coast Line Railroad Company *v.* Riverside Mills, 219 U. S. 186, holding: "Congress has power to prohibit a carrier engaged in interstate commerce from limiting by contract its liability beyond its own line, and the Carmack amendment of January 29, 1906, c. 3591, 34 Stat. 584, 595, to § 20 of the interstate-commerce act, making such carriers liable for loss or damage to merchandise received for interstate transportation beyond their own lines, notwithstanding any contract of exemption in the bill of lading, is a valid exercise of such power, and is not in conflict with the due-process provision of the fifth amendment." Accordingly the trial judge did not err in refusing the writ of certiorari.

No. 4069. SEPTEMBER 20, 1924.

Certiorari. Before Judge Bell. Fulton superior court. March 26, 1923.

On November 17, 1920, at Reidsville, North Carolina, the Southern Railway Company issued its bill of lading to R. P. Richardson & Company Incorporated, for 24 cases of smoking tobacco, consigned to W. G. Baker at Winona in the State of Mississippi. The bill of lading recited that the property was received in apparent

good order, "which said company agrees to carry to its usual place of delivery at said destination, if on its road, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property, over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions, whether printed or written, herein contained (including conditions on back hereof), and which are agreed to by the shipper and accepted for himself and his assigns." On the back of the bill of lading was the following: "Conditions. Section 2. In issuing this bill of lading this company agrees to transport only over its own line, and, except as otherwise provided by law, acts only as agent with respect to the portion of the route beyond its own line. No carrier shall be liable for loss, damage, or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier, except as such liability is or may be imposed by law; but nothing contained in this bill of lading shall be deemed to exempt the initial carrier from any such liability so imposed." The property was transported by the Southern Railway Company without default or negligence on its part, and delivered to the Columbus & Greenville Railroad, the delivering carrier, at Columbus, Mississippi, in good order and without exception, to be transported by such delivering carrier to the point of destination. The property was lost while it was being transported by the delivering carrier, and it was by the default of that road that the loss occurred. The consignee recognized the liability of the delivering carrier and filed claim with it for the loss of the shipment, and the delivering carrier recognized its liability and issued its voucher in payment of the claim; but on June 4, 1921, and before the voucher was presented for payment, the delivering carrier was placed in the hands of a receiver on the ground of insolvency, and has ever since been insolvent; and the receiver refused payment of the voucher. Afterward a claim was filed with the Southern Railway Company for the loss. A suit against that company was instituted by the consignee, in the municipal court of Atlanta, for the value of the property, and resulted in a judgment for the plaintiff. The defendant filed a petition for certiorari, which was duly sanctioned; but on the

hearing the certiorari was overruled, and final judgment was rendered against the defendant, and it excepted. The petition for certiorari alleged: (a) That under the agreed facts any liability of the defendant arose only out of the act of Congress of June 29, 1906, ch. 176 (4 Fed. Stat. Ann. 507), commonly known as the Carmack amendment to the interstate-commerce act; that the aforesaid act, in fixing liability upon it as the initial carrier, exacts response from it for the default of another carrier, without possibility of its full reimbursement out of the carrier at fault; and that said provision of the act of Congress for recovery over out of the carrier at fault is in this case meaningless in practical effect, and therefore would, to that extent, amount to a taking of the property of the defendant without due process of law, in violation of the fifth amendment to the constitution of the United States. (b) That the act of Congress aforesaid created an involuntary relation of principal and agent between the initial carrier and the delivering carrier, and under the act of Congress the defendant as the initial carrier was forced to issue the bill of lading through to destination, and the delivering carrier was made the agent of the defendant, not through its selection, but under the mandatory and compulsory provisions of the act; and that the effect of the act, therefore, in this case was to force an insolvent agent upon the defendant and to exact damages from it for such agent's default, and for this reason the act of Congress is unconstitutional and void, as it seeks to deprive the defendant of its property without due process of law, contrary to the provisions of the fifth amendment to the constitution of the United States.

*McDaniel & Neely* and *Kendrick L. Scott,* for plaintiff in error. *Watkins, Russell & Asbill,* contra.

ATKINSON, J. The pertinent portions of the statute which is alleged to be unconstitutional are: "That any common carrier, railroad, or transportation company . . receiving property for transportation from a point in one State . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, . . and no contract, receipt, rule, [or] regulation . . shall exempt such common carrier, railroad, or

transportation company from the liability hereby imposed. Provided . . that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law. . . That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof." 4 Fed. Stat. Ann. (2d ed.) 506 et seq., § 20 [K, L]. In two forms of statement it is urged that the statute should be held violative of the clause in the fifth amendment to the Federal constitution inhibiting deprivation of property of a person without due process of law.

The same statute was assailed as violative of the same provisions of the Federal constitution, in the case of Atlantic Coast Line Railroad Co. v. Riverside Mills, 219 U. S. 186 (31 Sup. Ct. 164, 55 L. ed. 167, 31 L. R. A. (N. S.) 7), and its constitutionality was sustained. Mr. Justice Lurton made the following statement of facts: "This was an action to recover the value of goods received by the Atlantic Coast Line Railroad at a point on its line in the State of Georgia, for transportation to points in other States. The agreed statement of facts showed that the goods were safely delivered by the Atlantic Coast Line Railroad to connecting carriers, and were lost while in the care of such carriers; and the question is whether the initial carrier is liable for such loss. The stipulated facts showed that the goods were tendered to the Atlantic Coast Line Railroad and through bills of lading demanded therefor, which were duly issued, as averred, on the dates named in the petition. That the goods so received were forwarded over the lines of the receiving road and in due course delivered to a connecting carrier engaged in interstate shipment for continuance of the transportation. It was also stipulated 'that the Riverside Mill made constant and frequent shipments over the Atlantic Coast Line, and had a blank form of receipt, like the attached, marked A,' which the Riverside Mill filled out, showing what goods it had loaded into cars and the name of the consignee; said receipt containing a stipulation that the shipment is 'per conditions of the company's

bill of lading,' and that the Atlantic Coast Line Railroad Company, on said receipts prepared by the Riverside Mill, issued, for each of the shipments hereinbefore referred to, bills of lading on forms like that attached, marked exhibit 'B.' Upon the reverse side of the bill of lading were certain conditions, one of which was that 'No carrier shall be liable for loss or damage not occurring on its portion of the route.' The tenth clause thereof was in these words: 'This bill of lading is signed for the different carriers who may engage in the transportation, severally but not jointly, each of which is to be bound by and have the benefits of the provisions thereof, and in accepting this bill of lading the shipper, owner, and consignee of the goods, and the holder of the bill of lading agree to be bound by all its stipulations, exceptions, and conditions, whether printed or written.' The court below, upon this state of facts, instructed a verdict for the plaintiff, upon which there was judgment for the amount of the verdict, and, upon motion of the plaintiff, an attorney's fee of $100 was ordered to be taxed as part of the costs in the case. Thereupon error was assigned, and this writ of error sued out by the railroad company." In support of the grounds of attack in that case it was insisted by the complaining initial carrier, among other things: (a) That the statute depriving the carrier of the right to make a just and reasonable contract is contrary to the fifth amendment. (b) That the statute, in providing that the initial carrier shall issue a bill of lading and shall be liable to the holder of the bill of lading for any damage caused by any connecting carrier, makes the initial carrier liable for the debts of the connecting carrier, in violation of the fifth amendment. The facts of the case and contentions made were closely similar to those made in the present case. The opinion stated and applied principles that are applicable to the case under consideration, and sustained the statute as against the grounds of attack now made. The principles and reasoning of the court can not be better stated than to quote at length from the opinion. It was said:

"Liability is confessedly dependent upon the provision of the act of Congress regulating commerce between the States, known as the Carmack amendment of January 29, 1906, c. 3591, § 7, 34 Stat. at Large, 584, 595. The twentieth section of the act of February 4, 1887, c. 104, 24 Stat. at Large, 379, as changed by the Carmack amendment, reads as follows: [quoting from the

act as indicated above.] . . The power of Congress to enact this legislation has been denied, first, because it is said to deprive the carrier and the shipper of their common-law power to make a just and reasonable contract in respect to goods to be carried to points beyond the line of the interstate carrier; and, second, that in casting liability upon the initial carrier for loss or damage upon the line of a connecting carrier, the former is deprived of its property without due process of law. The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce, and 'receiving property for transportation from a point in one State to a point in another State,' as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents. Independently of the Carmack amendment the carrier, when tendered property for such transportation, might elect to contract to carry to destination, in which case it necessarily agreed to do so through the agency of other and independent carriers in the line; or, it might elect to carry safely over its own lines only, and then deliver to the next carrier, who would then become the agent of the shipper. In the first case the receiving carrier's liability, as carrier, extends over the whole route, for, on obvious grounds, the principal is liable for the acts of its agent. In the other case its carrier liability ends at its own terminal, and its further liability is merely that of a forwarder. Having this power to make the one or the other contract, the only question which has occasioned a conflict in the decided cases was whether it, in the particular case, made the one or the other.

"The general doctrine, accepted by this court, in the absence of legislation, is, that a carrier, unless there be special contract, is only bound to carry over its own line and then deliver to a connecting carrier. That such an initial carrier might contract to carry over the whole route was never doubted. It is equally indisputable that if it does so contract, its common-law carrier liability will extend over the entire route. Railway *v.* McCarthy, 96 U. S. 258, 266; Railroad *v.* Pratt, 22 Wall. 123; Railroad *v.* American Trading Co., 195 U. S. 439; Muschamp *v.* Lancaster Railway Co., 8 M. & W. 421. The English cases beginning with Muschamp *v.* Lancaster Railway Company, 8 M. & W. 421, decided in 1841, down to Bristol &c. Railway *v.* Collins, 7 H. L. Cases, 194, have consistently held that the mere receipt of property for transportation to

a point beyond the line of the receiving carrier, without any qualifying agreement, justified an inference of an agreement for through transportation and an assumption of full carrier liability by the primary carrier. The ruling is grounded upon considerations of public policy and public convenience, and classes the receipt of goods so designated for a point beyond the carrier line as a holding out to the public that the carrier has made its own arrangements for the continuance by a connecting carrier of the transportation after the goods leave its own line. There are American cases which take the same view of the question of evidence thus presented. Some of them are Railroad *v.* Campbell, 7 Heisk. (Tenn.) 257; Railroad *v.* Mt. Vernon Co., 84 Alabama, 175; *Railroad* v. *Hasselkus, 91 Georgia,* 384; Beard *v.* Railroad, 79 Iowa, 531; Kyle *v.* Railroad, 10 Rich. (S. C.) 382; Railroad *v.* Wilcox, 84 Illinois, 240; Railroad *v.* Rogers & Hartsell, 6 Heisk. (Tenn.) 143. Upon the other hand, many American courts have repudiated the English rule which holds the carrier to a contract for transportation over the whole route, in the absence of a contract clearly otherwise, and have adopted the rule that unless the carrier specifically agrees to carry over the whole route its responsibility, as a carrier, ends with its own line, and that for the continuance of the shipment its liability is only that of a forwarder. The conflict has, therefore, been one as to the evidence from which a contract for through carriage to a place beyond the line of the receiving carrier might be inferred.

"In this conflicting condition of the decisions as to the circumstances from which an agreement for through transportation of property designated to a point beyond the receiving carrier's line might be inferred, Congress by the act here involved has declared, in substance, that the act of receiving property for transportation to a point in another State and beyond the line of the receiving carrier shall impose on such receiving carrier the obligation of through transportation with carrier liability throughout. But this uncertainty of the nature and extent of the liability of a carrier receiving goods destined to a point beyond its own line was not all which might well induce the interposition of the regulating power of Congress. Nothing has perhaps contributed more to the wealth and prosperity of the country than the almost universal practice of transportation companies to co-operate in making

through routes and joint rates. Through this method a situation has been brought about by which, though independently managed, connecting carriers become in effect one system. This practice has its origin in the mutual interests of such companies and in the necessities of an expanding commerce. . . Through this well-known and necessary practice of connecting carriers there has come about, without unity of ownership or physical operation, a single-ness of charge and a continuity of transportation, greatly to the advantage of the carrier and beneficial to the great and growing commerce of the country. Along with this singleness of rate and continuity of carriage there grew up the practice by receiving carriers, illustrated in this case, of refusing to make a specific agreement to transport to points beyond its own line, whereby the connecting carrier for the purpose of carriage would become the agent of the primary carrier. The common form of receipt, as the court may judicially know, is one by which the shipper is compelled to make with each carrier in the route over which his package must go a separate agreement limiting the carrier liability of each separate company to its own part of the through route. As a result the shipper could look only to the initial carrier for recompense for loss, damage, or delay occurring on its part of the route. If such primary carrier was able to show a delivery to the rails of the next succeeding carrier, although the packages might and usually did continue the journey in the same car in which they had been originally loaded, the shipper must fail in his suit. He might, it is true, then bring his action against the carrier so shown to have next received the shipment. But here, in turn, he might be met by proof of safe delivery to a third separate carrier. In short, as the shipper was not himself in possession of the informa-tion as to when and where his property had been lost or damaged, and had no access to the records of the connecting carriers who in turn had participated in some part of the transportation, he was compelled in many instances to make such settlement as should be proposed.

"This burdensome situation of the shipping public in reference to interstate shipments over routes including separate lines of carriers was the matter which Congress undertook to regulate. Thus, when this Carmack amendment was reported by a conference committee, Judge William Richardson, a Congressman from Ala-

bama, speaking for the committee of the matter which it was sought to remedy, among other things, said: 'One of the great complaints of the railroads has been—and, I think, a reasonable, just, and fair complaint—that when a man made a shipment, say from Washington, for instance, to San Francisco, Cal., and his shipment was lost in some way, the citizen had to go thousands of miles, probably, to institute his suit. The result was that he had to settle his damages at what he could get. What have we done? We have made the initial carrier, the carrier that takes and receives the shipment, responsible for the loss of the article in the way of damages. We save the shipper from going to California or some distant place to institute his suit. Why? The reasons for inducing us to do that were that the initial carrier has a through route connection with the secondary carrier, on whose route the loss occurred, and a settlement between them will be an easy matter, while the shipper would be at heavy expense in the institution of a suit. If a judgment is obtained against the initial carrier, no doubt exists but that the secondary carrier would pay it at once. Why? Because the arrangement, the concert, the co-operation, the through-route courtesies between them would be broken up if prompt payment were not made. We have done that in conference.' (Cong. Rec. Pt. 10, p. 9580.)

"It must be conceded that the effect of the act, in respect of carriers receiving packages in one State for a point in another and beyond its own lines, is to deny to such an initial carrier the former right to make a contract limiting liability to its own line. This, it is said, is a denial of the liberty of contract secured by the fifth amendment to the constitution. To support this counsel cite such cases as Allgeyer *v.* Louisiana, 165 U. S. 589, Lochner *v.* New York, 198 U. S. 45, and Adair *v.* United States, 208 U. S. 161. This power to regulate is the right to prescribe the rules under which such commerce may be conducted. 'It is,' said Chief Justice Marshall, in Gibbons *v.* Ogden, 9 Wheat. 1, 197, 'a power vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States.' It is a power which extends to the regulation of the appliances and machinery and agencies by which such commerce is conducted. Thus in Johnson *v.* Southern Pac. Ry., 196 U. S. 1, an act prescrib-

ing safety appliances was upheld. And in Interstate Commerce Commission *v.* Illinois Central R. R. Co., 215 U. S. 452, it was held that the equipment of an interstate railway, including cars used for the transportation of its own fuel, was subject to the regulation of Congress. In Interstate Commerce Commission *v.* C. & A. Ry. Co., 215 U. S. 479, it was held to extend to the distribution of coal-cars to the shipper, so as to prevent discrimination. In The Employers' Liability Cases, 207 U. S. 463, 495, power to pass an act which regulated the relation of master and servant, so as to impose on the carrier, while engaged in interstate commerce, liability for the negligence of a fellow servant, for which at common law there was no liability, and depriving such carrier of the common-law defense of contributory negligence save by way of reduction of damages, was upheld. In Addyston Pipe Co. *v.* United States, 175 U. S. 211, and Northern Securities Co. *v.* United States, 193 U. S. 197, it was held that this power of regulation extended to and embraced contracts in restraint of trade between the States.

"It is obvious, from the many decisions of this court, that there is no such thing as absolute freedom of contract. Contracts which contravene public policy cannot be lawfully made at all, and the power to make contracts may in all cases be regulated as to form, evidence, and validity as to third persons. The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests. Undoubtedly the United States is a government of limited and delegated powers; but in respect of those powers which have been expressly delegated, the power to regulate commerce between the States being one of them, the power is absolute except as limited by other provisions of the constitution itself. Having the express power to make rules for the conduct of commerce among the States, the range of congressional discretion as to the regulation best adapted to remedy a practice found inefficient or hurtful is a wide one. If the regulating act be one directly applicable to such commerce, not obnoxious to any other provision of the constitution, and reasonably adapted to the purpose by reason of legitimate relation between such commerce and the rule provided, the question of power is foreclosed. 'The test of power,' said Mr. Justice White, speaking for this court

in the Employers' Liability Cases, cited above, 'is not merely the matter regulated, but whether the regulation is directly one of interstate commerce, or is embraced within the grant conferred on Congress to use all lawful means necessary and appropriate to the execution of the power to regulate commerce.'

"That a situation had come about which demanded regulation in the public interest was the judgment of Congress. The requirement that carriers who undertook to engage in interstate transportation, and as a part of that business held themselves out as receiving packages destined to places beyond their own terminal, should be required, as a condition of continuing in that traffic, to obligate themselves to carry to the point of destination, using the lines of connecting carriers as their own agencies, was not beyond the scope of the power of regulation. The rule is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility. The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier. Neither does the regulation impose an unreasonable burden upon the receiving carrier. The methods in vogue, as the court may judicially know, embrace not only the voluntary arrangement of through routes and rates, but the collection of the single charge made by the carrier at one or the other end of the route. This involves frequent and prompt settlement of traffic balances. The routing in a measure depends upon the certainty and promptness of such traffic-balance settlements, and such balances have been regarded as debts of a preferred character when there is a receivership. Again, the business association of such carriers affords to each facilities for locating primary responsibility as between themselves which the shipper cannot have. These well-known conditions afford a reasonable security to the receiving carrier for a reimbursement of a carrier liability which should fall upon one of the connecting carriers as between themselves. But it is said that any security resulting from a voluntary agreement constituting a through route and rate is destroyed if the receiving carrier is not at liberty to select his own agencies for a continuance of the transportation beyond his own line. This is an objection which has no application to the present case. This action was for loss and damage arising from several distinct shipments to different places beyond the line of the plaintiff in error, who was the initial or

receiving carrier. The presumption, from the absence of anything to the contrary in the record, is that the routing was over connecting lines with whom the plaintiff in error had theretofore made its own arrangements and rate. This record presents no question as to the right of the initial carrier to refuse a shipment designated for a point beyond its own line, nor its right to refuse to make a through route or joint rate when such route and rate would involve the continuance of a transportation over independent lines. We therefore refrain from any consideration of the large question thus suggested. The shipments involved in the present case were voluntarily received by an initial carrier who undertook to escape carrier's liability beyond its own line by a provision limiting liability to loss upon its own line. This was forbidden by the Carmack amendment, and any stipulation and condition in the special receipt which contravenes the rule in question is invalid.

"Reduced to the final results, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one State to be transported to a point in another involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route, with the right to reimbursement for a loss not due to his own negligence. The conditions which justified this extension of carrier liability we have already adverted to. The rule of the common law which treated a common carrier as an insurer grew out of a situation which required that kind of security for the protection of the public. To quote the quaint but expressive words of Lord Holt, in Coggs *v.* Bernard, 2 Ld. Raymond, 909, when defending and applying the doctrine of absolute liability against loss not due to the act of God or the public enemy, 'this rule,' said he, 'is a politick establishment contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust these sort of persons that they may be safe in their ways and dealing.' If it is to be assumed that the ultimate power exerted by Congress is that of compelling co-operation by connecting lines of independent carriers for purposes of interstate transportation, the power is still not beyond the regulating power of Congress, since without merging identity of separate lines or operation it stops with the requirement of oneness of charge, continuity of

transportation and primary liability of the receiving carrier to the shipper, with the right of reimbursement from the guilty agency in the route.   That there is some chance that this right of recoupment may not be always effective may be conceded without invalidating the regulation.   If the power existed and the regulation is adapted to the purpose in view, the public advantage justifies the discretion exercised and upholds the legislation as within the limit of the grant conferred upon Congress.   .   .

"But it is said that the act violates the fifth amendment by taking the property of the initial carrier to pay the debt of an independent connecting carrier whose negligence may have been the sole cause of the loss.   But this contention results from a surface reading of the act, and misses the true basis upon which it rests.   The liability of the receiving carrier which results in such a case is that of a principal for the negligence of his own agents. In substance Congress has said to such carriers, 'If you receive articles for transportation from a point in one State to a place in another, beyond your own terminal, you must do so under a contract to transport to the place designated.   If you are obliged to use the services of independent carriers in the continuance of the transit, you must use them as your own agents and not as agents of the shipper.'   It is, therefore, not the case of making one pay the debt of another.   The receiving carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although, as between themselves, the company actually causing the loss may be primarily liable."

In the case of Atlantic Coast Line Railroad Co. *v.* Glenn, 239 U. S. 388 (36 Sup. Ct. 154, 60 L. ed. 344), it was held: "The statute of South Carolina making the delivering carrier responsible for damages to goods on through bills of lading in intrastate shipments is not unconstitutional under the fourteenth amendment, as depriving a delivering carrier who voluntarily received the goods from a connecting carrier of its property without due process of law."   In the opinion it was said: "The case is controlled by Atlantic Coast Line *v.* Riverside Mills, 219 U. S. 186.   In that case the constitutionality of the act of Congress known as the Carmack amendment to the act to regulate commerce was considered, the question presented being whether Congress under its power to regulate commerce could make an initial carrier liable to the holder

of a bill of lading issued by it for a through interstate shipment of property over its own and connecting lines for a loss occurring after the property had been delivered by it to a connecting carrier and while in the control of such carrier. It was decided that the act was a valid regulation of interstate commerce, and hence that no rights of the initial carrier secured by the fifth amendment had been violated. It is true that case involved the power of Congress over interstate, while this concerns the power of a State over intrastate, commerce; but the reasoning by which the conclusion as to the existence of the power was sustained in that case compels a like conclusion with reference to the power of a State over commerce wholly within its borders. Indeed, in argument the controlling force in a general sense of the Riverside Case is conceded; but it is insisted that it can here have no application, because liability is imposed by the State statute upon the terminal and intermediate carriers as well as the initial or receiving carrier, while in the Riverside Case the liability alone of the latter was under consideration. But it is obvious that this proposition challenges not the power but the wisdom of exerting it, since in the nature of things the power to constitute an initial carrier the agent of the terminal carrier is not different from the power to make the terminal carrier the agent of the initial carrier. Of course we confine ourselves to the case before us, and therefore do not decide what would be rights of the terminal carrier if against its will it had been compelled to accept the cattle from the initial carrier in a damaged condition, or if they had never been delivered to it. These questions are not presented by the record, since it is not contended that the acceptance of the cattle by the Atlantic Coast Line was not voluntary." In the case now for consideration, the goods were received in interstate commerce voluntarily for shipment to the point of destination on a different line of railroad from that of the initial carrier. The case falls within the principle of the above decisions, and the court did not err in overruling the certiorari.

*Judgment affirmed. All the Justices concur.*