**AMERICAN TRANSP. CO. v. SWIFT & CO.,**
**and five other cases.**

District Court, S. D. New York. October 10, 1928.

160

See, also, 22 F.(2d) 457.

Loomis & Ruebush, of New York City (Homer L. Loomis and Glenn W. Ruebush, both of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Charles R. Hickox and Clement C. Rinehart, both of New York City, of counsel), for respondents and cross-libelants.

KNOX, District Judge. The Circuit Court of Appeals having held that the causes of action alleged by American Transportation Company against the above-named respondents survived the dissolution of libelant [see American Transportation Co. v. Swift & Co., 24 F.(2d) 310], the cases are before me for decision upon the merits.

The actions against the several respondents are identical, except as the amounts of money sought to be recovered, and their object is to collect additional freight, and certain other charges, under a clause contained in printed bills of lading, issued on shipments of foodstuffs carried to Rotterdam by libelant's vessels, A. A. Raven, Ruby and Robert M. Thompson.

The clause in question reads as follows:

"Any delay to steamer caused by any Government, Rulers, or officials for examination of cargo or steamer caused by reason of suspicion as to the cargo being contraband or as to its destination, ownership or consignment, shall be paid for at an average increase in freight based on steamer's earnings, had the voyage not been interrupted or delayed. Such additional freight to be paid by shippers and/or consignees and steamer to have a lien on cargo for same."

Early in 1915, each of the respondents was desirous of securing steamer space in which meats and oils might be shipped abroad, and negotiations with a view to arranging for space was carried on by a ship broker named Charles F. Rundspaden. He acted at the direction of Ervin P. Hinds, who was traffic manager for Armour & Co. Rundspaden took up the matter with David E. H. Jones (now deceased), of James W. Elwell & Co., who were steamship agents. After an interview or two, these men came to an agreement that the steamer A. A. Raven, which was expected to sail about February 15, 1915, would be put at the disposal of respondent for the carriage of the merchandise.

On January 30, 1915, Elwell & Co., acting through H. C. Perine, addressed a letter to Armour & Co., which appears to have been delivered to Rundspaden. It was in these terms:

"We confirm closing with you today the American Steamship "A. A. Raven" for a voyage from New York to Rotterdam with a full cargo of provisions at 150/— & 5% per 2240 lbs. for large packages and 155/— & 5% per 2240 lbs. for small packages, freight prepaid."

"This steamer is expected to sail from New York about February 15th.

"We estimate this steamer's capacity to be, approximately, 2,615 tons—based on the cargo stowing in 65 cubic ft. per ton, according to your estimate of measurement of cargo. It is understood, however, that we are not to be responsible for any claims, in the event that this steamer should shut out any cargo. It is further understood that you must supply sufficient cargo to fill this steamer; and you are to deliver same as fast as required by steamer.

"It is understood that a part of the cargo will consist of small packages, and we now

await advices from you as to how the cargo will be divided up in respect to quantity and kind of provisions."

At or about the time of the receipt of the letter, Rundspaden is said to have received a proposed freight contract, drawn by Jones, which contained a clause covering the possible detention of the steamer that was substantially the same, if not identical with, that quoted above. According to the respondents, it was unacceptable to Rundspaden and Hinds. As a result, they called on Jones on February 1, 1915, and voiced their objections. After considerable talk back and forth, Jones is alleged to have said that he would not insist on the provisions, but would "go" them without it. Rundspaden thereupon drew freight contracts for account of each of the respondents. Excepting for the names of the shippers and contract numbers, they were in substantially identical terms. That of Armour & Co. will be quoted:

In ink:

"Accepted: Jas. W. Elwell, Agents.
"Freight Contract.

"No. 3656     New York, February 3, 1915.

"Engaged freight room for account of Armour & Company per American steamer A. A. Raven expected to sail about Feb. 15th for port of Rotterdam. Jas. W. Elwell & Co. Agents, for 80 cars Lard and Provisions quantity more or less at steamer's option. Agents agree that the shippers named in this contract and contracts numbered 895 and 1014 to have the entire tonnage for this sailing. Regular through Railroad bills of lading will be accepted. Ladings and certificates to bear clause 'Goods intended for consumption in Holland.' No order or notify ladings will be accepted. Warranted no German, Austrian or Turkish ownership, consignment or destination.

"At Large pkgs 150—and 5 percent primate per 2240 lbs.

Small pkgs 155/—

"Freight prepaid in New York
"Subject to war clause
"C. F. Rundspaden & Co. Brokers,
     "[Signed]   C. F. Rundspaden."

On February 8, 1915, similar contracts were executed with respect to the steamer Ruby, and about a week later others were made as to the Robert M. Thompson.

A considerable portion of the freight originated in Chicago, and it was forwarded to New York under railroad bills of lading which contained this clause:

"18. That the property covered by this bill-of-lading is subject to all conditions expressed in the regular form of bills-of-lading in use by the steamship company at time of shipment.   ⁂   *   * "

Such portion of the cargo as went aboard the ship in New York was evidenced by ocean bills of lading issued by the steamers which contained the detention clauses upon which libelant's suits are based. From the testimony of the local representatives of the shippers, the clause was neither noticed nor read until after the claim was made that it had become applicable to the freight carried by the steamers.

The A. A. Raven sailed from New York on February 13, 1915. She had an uneventful voyage until the 27th of the month, when she reached the English Channel. She was there met by a British patrol boat, and stopped. A naval officer told the steamer's captain to proceed along the channel within three miles of the coast, where another patrol boat would be encountered. The latter was met at Dover. One of her officers boarded the steamer, asked for her papers, and directed the master to anchor his vessel off a guardship standing nearby in the Downs. The boarding officer added that, inasmuch as the ship carried meat products, the (British) War Department had to satisfy itself that none of this cargo was for Germany, with which Britain was then at war. The official ordered the Raven to hoist the detention flag X, and not to have communication with shore. The steamer complied with the demands made upon it, and remained at anchorage until April 1, 1915. Meanwhile, on March 7, the master of the Raven, who had not been permitted to go ashore, sent a letter to the American ambassador in London protesting against the delay of the steamer, and complaining that communication with her owners was not allowed. The letter was sent through the guardship, so that its officers might read its contents. Four days later, a British patrol boat went alongside the Raven, and gave word to her master that he might go ashore and communicate with his owners, and also with their London agents, Frank S. Strick & Co. Getting in touch with a representative of the agents, the master protested his treatment, and filed the same at Deal. Thereafter, he was permitted to go ashore each day. Aside from writing to the London agents of the steamer, and to the American ambassador, inquiring as to progress being made towards bringing about the release of the ship, the master took no affirmative action. On April 1, 1915, an officer from the patrol boat went aboard the Raven, and asked the master if he would give a sworn statement

that he would discharge no cargo in 'Rotterdam until he had permission to do so from the British consul at that port, and not before the foodstuffs should be consigned to the Netherlands Overseas Trust. An affidavit to such effect was executed. The steamer's hatches were then sealed by the naval officers, and the master was told to proceed to Rotterdam, but not to open his holds until he had reported to the British consul at that port, and informed him that the cargo was not consigned to the Netherlands· Overseas Trust. The Raven lowered her detention flag, and proceeded to Rotterdam, arriving there on April 2, 1915.

The steamer Ruby left New York on March 1, 1915. All went well with her until March 18, when she, too, encountered the English naval authorities in the channel. Her experience until April 1 was not unlike that of the Raven. On that date she was permitted to proceed on the undertaking of her master that he would only deliver the cargo to the Netherlands Overseas Trust. The Ruby got to Rotterdam on April 2.

The Robert M. Thompson left New York on March 12, 1915, and reached the Downs on March 30th. She, in the fashion of the Raven and the Ruby, was detained by officials of the British navy. On April 1, her master complied with the demands made upon him, and undertook that he, too, would deliver his cargo only to the Netherlands Overseas Trust. The Thompson then proceeded, and arrived at her destination on April 2, 1915.

The three masters at once called upon the agents for the steamers, Messrs. Wambersie & Son. A representative of that concern, together with the captain of the Raven, visited the British consul. Wambersie & Son gave assurances that the cargoes, if discharged, would not be delivered save upon surrender of bills of lading indorsed by the Netherlands Overseas Trust. The vessels were then permitted to discharge their cargoes on docks controlled by the steamers' agents. To aid in carrying out the undertaking of the agents, the masters of the ships, on April 8, 1915, executed a writing of the following tenor:

"The undersigned, masters of the American steamers: A. A. Raven, Ruby, and Robert M. Thompson, all arrived here from New York with a full cargo of provisions, herewith authorize their Agents, Messrs. Wambersie & Son, not to deliver any of said cargo unless against delivery of documents duly endorsed by the Netherlands Overseas Trust and against payment of such freight and charges as agreed upon by terms and conditions of the Bills-of-lading, also to settle all disputes and differences that may arise on our and/or our steamers' behalf."

In passing, it should be noted that the ocean bills of lading of the Raven were dated February 12, 1915; those of the Ruby, February 26, 1915, and those of the Robert M. Thompson, March 10, 1915. They provided that the goods carried by the Raven and the Ruby should be delivered to the respective consignors at Rotterdam. The consignee of the goods on the Robert M. Thompson was the Netherlands Overseas Trust.

James W. Elwell & Co. seems to have learned of the detention of the Raven about March 10. In any event, on March 12, that firm addressed a letter to Armour & Co. at its New York office, in which it confirmed a previous advice that Raven was being detained, and quoted a telegram from the American ambassador to the effect that the British government had informed the embassy that the vessel could not proceed until the cargo was consigned to Netherlands Overseas Trust, and that the embassy had presented the ship's manifest to the foreign office, and made representations.

Armour & Co. were requested to "do the needful at once as the delay will be wholly for account of the cargo, of which please take due notice."

On the same date, another letter of James Elwell & Co., addressed to Armour & Co., at New York, called attention to a cable received from the London agents of the vessel, which read:

"Is cargo 'R. M. Thompson' 'Ruby' consigned to Netherlands Overseas Trust—otherwise must take necessary steps immediately to prevent any delay."

To this Elwell & Co. added:

"As the S. S. Ruby is due off the English coast, within a few days, please do the needful to avoid heavy charges for delay."

A third letter of March 12, 1915, was also sent by Elwell & Co. to Armour & Co. in New York. It was to the effect that at 3 p. m. of that day a representative of Armour & Co. had called at the office of the steamers' agents with instructions to make a change in the name of the consignees of the provisions on the Robert M. Thompson. Elwell & Co. went on to say:

" * * * Your instructions have come too late, as this steamer sailed last night with all documents changed to read 'Netherlands Overseas Trust Company' as consignees, in accordance with telegram received from your Chicago office yesterday.

"We hope you have cabled your London

branch to have the consignee's name changed on the papers of the 'A. A. Raven' and 'Ruby.'"

"The 'Raven' arrived at Dover on March 2nd, and has been detained there ever since owing to incorrect consignment of merchandise, and the Ruby is due there in a few days; inasmuch as her documents are made out in the same way she will undoubtedly have the same difficulty unless it is anticipated and corrected.

' "You will undoubtedly appreciate the fact that detention to our steamers means a loss of about $1,100 per day, which of course will be collected pro-rata from the consignees; but we do not wish to increase the amount by further detention, and we trust that you will act immediately in this respect."

On March 13, 1915, this correspondence was forwarded to the Chicago office of Armour & Co. by its local representative, and came to the attention of Hinds, whom, it will be recalled, said that he and Jones discussed the detention clause originally contained in Elwell & Co.'s draft of the freight contract.

On March 15, Hinds wrote to Martin acknowledging receipt of the communications of Elwell & Co., and said:

"*   *   * We want it definitely understood that we will assume nothing in connection with demurrage due to detention of these steamers account of billing, as these restrictions were not put up by Elwell & Co., neither were they considered necessary until it was so demonstrated by detention of steamer, and while it may be in order for the Netherlands Government to put on such restrictions as they see fit, it is very doubtful whether or not England has any authority to intercept these shipments and insist on the Netherlands Government restrictions being carried out.

"However, if change in billing of these American Flag steamers prove necessary to get the goods through, we will undoubtedly have to comply with it."

Three days later Hinds wired Martin as follows:

"Ascertain and advise on what clause in B/L Elwell claims we are responsible for demurrage due to detention steamer Raven. Understand most of this shipment moved on through lading on which we discover no clause covering this and assume it must be some war clause stamped on by them, in which case would like to know how it reads and also how it got on through ladings."

A second telegram from Hinds to Martin, also dated March 18, 1915, requested that a copy of Elwell's lading be sent to him, and asked for information as to whether the detention clause was stamped or printed on the ladings, in the event that Martin had previously seen it, and added:

"This clause rather unusual and not incorporated in any ladings that have come to our attention."

On the same day, Martin replied to each of Hinds' messages. In one he quoted the clause, and in the other, he stated that the clause was "printed in body of ladings and has not come to our attention before. Making check all later ladings. See if contain similar clause. Mailing copy of lading tonight."

Subsequently to the foregoing, there were negotiations between the parties with reference to the release of the merchandise; Elwell & Co., asserting a lien for the detention of the steamers and respondents denying liability. Finally, however, a stipulation was entered into whereby the goods were released upon the understanding that the rights of the parties should be adjusted in this court. There was some delay in carrying out the arrangement contemplated by the stipulation, and in procuring consents to a disposition of the goods to persons satisfactory to Netherlands Overseas Trust. In the course of such delay, respondent's merchandise suffered some damage. For this injury, respondents have filed cross-libels against American Transportation Company, charging it with having wrongfully declined to make due delivery of the cargoes, and with a consequent loss of a market for the same.

The foregoing statement furnishes a general outline of the state of facts giving rise to the present controversy. While respondents' pleadings do not specifically charge the American Transportation Company with fraud in having inserted the detention clause in the ocean bills of lading, the defense to the libels is little short of that allegation. It is said that Elwell & Co. for many years had been the agents of the Fabre Steamship Line, which operated a fleet of vessels between the United States and Mediterranean ports, and that, in preparing the bills of lading in question, the general form of the Fabre Line bills was followed. Instead of copying the form in its entirety, Elwell & Co. is charged with having surreptitiously, as it were, inserted the objectionable clause in small type within the body of the conditions to be found in the Fabre Line ladings, and with having failed to call respondents' attention to the same until after each of the cargoes had been shipped, and the steamers actually detained.

The bills of lading were drafted by a man named Perine, who testified at the trial. His

explanation was that never before had the American Transportation Company sent vessels through the war zone, and that he was desirous of protecting the owners against conditions which might reasonably be thought would be imposed upon the ships.

According to Perine, the British Admiralty had, prior to the departure of the Raven, adopted the practice of stopping merchant vessels passing through the English Channel bound for Northern European ports, and newspapers were carrying reports to such effect. He felt, therefore, that he was entirely justified in protecting the vessels for which his firm was the agent, in the event they should encounter detention. When asked the reason that the clause had been incorporated in the midst of conditions usually to be found in ladings, instead of being placed at the beginning or end of the printed matter, Perine replied that the clause appeared to fit in the position in which it was placed. An inspection of the contested lading reveals that the clause was inserted among other stipulations which, upon the happening of certain contingencies, would place liability upon the cargo; and there is, I believe, some basis for Perine's testimony that the clause "fitted in" at the position given it. The printed matter of the bills is easily readable, and the amount of space occupied by the terms of shipment, considering the general form and substance of such documents, is not excessive. The clause, unless it had been stamped on the face of the bill in large type, stood as much chance of being observed as would have been the case had it been placed at the beginning or end of the printed matter. The fact is that none of the representatives of the shippers paid the slightest attention to the conditions and exceptions appearing on the bills. The documents were received by clerks of the shippers and filed away, without thought as to the subject-matter of the terms contained therein.

At this point, it may be said that the original contracts for the use of the steamers contemplated that the carriage would be "subject to war clause." The content of this clause was not specified. Nevertheless, it was doubtless intended by the parties that the vessels would seek to protect themselves against the risk of interference with their voyages by any of the governments that were then at war, and which, as all export shippers probably knew, were examining the cargoes of merchant vessels passing through the war zone. Under these circumstances, one would have expected diligent effort upon the part of the shippers to ascertain the terms of any war clause which might affect the liability of their goods.

Respondents, in their attempt to defeat libelants' suits, set much store by the decision of the Supreme Court, in Northern Pacific Railway Co. v. American Trading Co., 195 U. S. 439, 25 S. Ct. 84, 49 L. Ed. 269, where it was held that a special written contract to transport by more than one line of transportation, and to deliver within a specified time, is not affected by a provision in the printed portion of a through bill of lading, delivered to the consignor after the shipment of the goods, to the effect that the responsibility of the carrier issuing the bill of lading ceases at the terminus of its own line. In that case, there was a special contract made between the shipper and the initial carrier that the commodity to be transported should be carried by a particular steamship, which should leave a specified port on a definite date. The merchandise was not taken by the steamer, and the initial carrier was held liable for ensuing damages to the shipper. There, as here, the bill was not read by the clerk who received it. In addition, the document was immediately hypothecated as security for money borrowed on the shipment. Still further, at the time the bill was received by the shipper, the goods were en route to destination, and were beyond recall. The Supreme Court said:

"We do not state * * * that the bill of lading was not examined, for the purpose of insisting that an examination of such an instrument must always be shown before a contract can be predicated thereon. But where there is a valid contract already in existence, and it is urged that such a contract has been abrogated or changed by the receipt of a bill of lading, after goods have passed from the control of the shipper, we think it is important, upon the question of whether such original contract has, in fact, been abrogated, to show that the bill was never read in fact; that the conditions abrogating the original contract were among a number of other conditions printed in the bill in smaller type than the rest of the bill, and that the alleged acquiescence of the trading company in the change of the contract, by virtue of these conditions, is based upon the mere reception of the bill of lading by a clerk without any knowledge of the existence of these conditions and without evidence of any authority in him to consent to a modification of the contract already made by his employer."

█ If all the facts for which respondents here contend were to be found in their favor,

they might be entitled to a decision in line with the case just cited. I am unable, however, to reach a conclusion that the detention clause was discussed between Hinds, Rundspaden, and Jones, and that feature of the testimony must be eliminated.

At the start of Rundspaden's testimony, he definitely said that he and Hinds had discussed the detention clause with Jones. Later on, he stated that nothing was said upon the subject. Just what caused this contradiction is not clear, unless it be that he became doubtful as to whether the topic of conversation was the detention clause or the provision in the letter of Elwell & Co. of January 30, 1915, to the effect that liability would not be assumed for claims which might arise in the event that the steamer shut out a portion of the cargo.

It was on the 30th of January that Rundspaden communicated with Hinds over the telephone. At that time, he doubtless had before him the letter from Elwell & Co., which suggested the possibility that some cargo might be shut out. The letter, it will be remembered, was silent on the question of possible detention. On the same day, Hinds said that he was coming to New York to help handle the matter himself. He, in his testimony, first said that he discussed the detention clause with Rundspaden over the telephone. At another point, he declared the detention clause was not referred to, nor discussed, until he reached New York, and saw it in the freight contracts which had been drawn by Jones and sent to Rundspaden. This confusion is, perhaps, not unnatural, when it is considered that more than ten years elapsed between the happening of the events concerning which he testified and the time of the trial. In the meantime, the clause became of supreme importance. My disposition is to believe that, due to the vagaries of memory, matters which originally seemed important, but which have become inconsequential, are now forgotten, while others that were then not considered, but which are now vital, are believed to have been the subject of discussion. A reason for this thought is that, when Elwell & Co. acquainted Hinds with the information that the detention clause had become effective, he seems not to have recalled the talk which he now avers took place between himself and Jones. In none of his letters or telegrams does he mention the incidents upon which I am asked to dismiss the instant libels.

As will be seen by reference to his wire to Martin under date of March 18, 1915, he assumed the detention clause was based on "some war clause stamped on by (Elwell & Company) in which case (he) would like to know how it reads, and also how it got on the through ladings."

On his next wire, Hinds remarks that the clause is "rather unusual," and had not been incorporated in any ladings that had theretofore come to his attention.

The language employed in these telegrams, composed as it was within seven weeks after the alleged discussion of the detention clause with Jones, is not of a character to support Hinds' present testimony. If he discussed the detention clause on February 1, 1915, he would undoubtedly have recognized it when brought to his attention on March 15, 1915. There would have been no occasion to say that it was unusual, and that he had not previously seen it in bills of ladings. Neither would he have assumed it to be "some war clause" that had been stamped on the lading. He would have recognized it instantly for what he now says it was, viz. the fraudulent incorporation in the shipping documents of a clause which it was agreed should not affect the carriage of the goods. Hinds is a man of spirit, and wide experience. Had he thought for a moment that advantage had been taken of him, it is all but certain that he would have expressed himself in the most definite terms, not only to Elwell & Co., but to his own associates, and to Rundspaden. Whenever there is a sound basis for the expression of righteous wrath, men of the personality of Hinds do not ordinarily remain meek and quiescent. Yet, here, there is no document bearing a date near to that on which libelant asserted its claim, which even suggests that Hinds believed himself to be the victim of fraudulent or despicable conduct.

In consideration of what has been said, I shall refuse to find that the talk between Hinds, Rundspaden, and Jones was of the substance claimed by respondents. The case, therefore, must be decided without reference to such subject-matter. And, with it eliminated, a conclusion is not difficult.

Having regard to conditions as they were publicly known to exist in the war zone in the early part of 1915, the detention clause was, in my judgment, altogether reasonable. U. S. S. B. v. Durrell, 2 K. B. 739. The freight contracts provided that the goods might move on regular through railroad bills of lading, and a large portion of them came to seaboard on such document. They provided that the property covered thereby should be subject to all conditions expressed in the regular forms of bills of lading in use

by the steamship company at the time of shipment. The ocean bills of lading introduced in evidence are found to have been libelant's regular forms in use at the times the respective vessels set forth on their voyages. The bills had been printed by the transportation company, and had been filed with the Produce Exchange in New York, on or about February 10, 1915, three days before the Raven sailed. That they were available for inspection by the respondents before that date, had they cared to examine them, must be conceded, and I see no reason for holding that they do not express the contract of carriage between the parties. Transmarine Corporation v. Charles H. Levitt & Co. (C. C. A.) 25 F.(2d) 275; Strachan Shipping Co. v. Alexander Eccles & Co. (C. C. A.) 25 F.(2d) 361.

The foregoing points being passed, respondents further contend that libelants have failed to sustain the burden of showing that the detention of the steamers was caused by suspicion that their cargoes were contraband, or as to its destination, ownership, or consignment. With this, also, I must disagree. The fact is that the cargo was not permitted to proceed to Rotterdam until the naval authorities of Great Britain had satisfied themselves that the foodstuffs would be delivered only to the Netherlands Overseas Trust, or to such persons as met with the approval of that corporation. That it was a concern which enjoyed the confidence of the British Government, and which might be relied on to see that the merchandise should not reach Germany, is obvious. From a letter of the British Admiralty, it appears that the vessels were detained by Admiralty orders for the reason that they did not carry the guarantee of the Netherlands Overseas Trust.

In the early part of 1915, it was common knowledge that supplies and foodstuffs needed and desired by the Central Powers, unless supervised by responsible and reliable agencies, might, and probably did, reach Germany from Northern European countries. Shipments moving to such countries from the United States were under suspicion as to their destination, and, to the end that such goods should not find their way into Germany, Great Britain put into operation the effective measures which resulted in the detention of libelant's vessels. The loss arising from that action must fall on respondents.

The proof offered by respondents as to delay in releasing respondent's merchandise, after the matter of libelant's lien had been adjusted through the stipulation of the parties, is not of a character which will permit an assessment of damages against the owner of the ships.

Having in mind the conditions existing at Rotterdam, and in carrying on communication with foreign countries, libelants seem to have acted with reasonable diligence and despatch. The cross-libels will be dismissed, and libelants may have a decree.